UNITED STATES of America,
Plaintiff-Appellee,

v.

Douglas S. SZYCHER,
Defendant-Appellant.

No. 77–1345.

United States Court of Appeals,
Tenth Circuit.

Oct. 16, 1978.

HOLLOWAY, Circuit Judge.

Defendant Szycher was convicted after a jury trial on three counts of an indictment charging that he knowingly and intentionally distributed cocaine, a Schedule II controlled substance, on three occasions in April and May, 1976, in violation of 21 U.S.C. § 841(a)(1). He appeals the convictions and sentence,[1] arguing mainly: (1) that there is no rational basis for the classification of cocaine as a Schedule II narcotic drug, and that consequently he is subjected to the danger of loss of liberty without due process; (2) that the failure to apply the same lesser penalty to cocaine as is applied to other drugs with identical properties, characteristics and effects, and with fewer potential dangers than narcotics, violates the concept of equal justice; (3) that the conduct of the government, acting through Drug Enforcement Agency (DEA) personnel and their paid informer, so violated concepts of fundamental fairness and was so outrageous as to require dismissal of the case under due process principles or as an exercise of supervisory power by the courts; and (4) that the trial court erred in its instruction on entrapment.

It is convenient to detail the facts later as we discuss these separate appellate contentions.

Stephen M. Duncan, Denver, Colo. (Charles Eugene Grover of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., on the brief), for defendant-appellant.

Edward W. Nottingham, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., on the brief), for plaintiff-appellee.

Before SETH, Chief Judge, and HOLLOWAY and McKAY, Circuit Judges.

I

First, we consider defendant's challenges to the classification of cocaine as a narcotic drug, as well as to the penalties attached to its distribution. Defendant bases his arguments mainly on expert opinions and scientific evidence relating to the nature of cocaine, contending that both equal protection and due process principles are violated by the application of 21 U.S.C. § 841(a) to cocaine under its classification as a Schedule II controlled substance. See 21 U.S.C. § 812 and 21 C.F.R. § 1308.12(b)(4).

1. Defendant was given sentences of two years on each of the three counts, with the sentences on counts two and three to run concurrently with that on count one. It was ordered that defendant serve 90 days of the sentence and that the remainder of the sentence be suspended, and that defendant be placed on probation for four years as to each count, with the period of probation on counts two and three to run concurrently with that on count one.

Our court has recently rejected similar arguments. *United States v. Lane,* 574 F.2d 1019, 1022 (10th Cir.); *United States v. Smaldone,* 484 F.2d 311, 319–20 (10th Cir.), cert. denied, 415 U.S. 915, 94 S.Ct. 1411, 39 L.Ed.2d 469. Congress could rationally classify cocaine as a Schedule II controlled substance for regulatory and penalty purposes, regardless of its proper medical classification. *United States v. Wheaton,* 557 F.2d 275, 277–78 (1st Cir.); *United States v. Marshall,* 532 F.2d 1279, 1288 (9th Cir.); *United States v. Harper,* 530 F.2d 828 (9th Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80; see also *State v. Erickson,* 574 P.2d 1, 15–18 (Alaska); *contra Commonwealth v. Miller,* 20 Crim.L.Rep. (BNA) 2331 (Roxbury, Mass., Dist.Mun.Ct.). Normally a legislative classification will not be set aside if any state of facts rationally justifying it is demonstrated to or perceived by the courts. *United States v. Maryland Savings-Share Ins. Corp.,* 400 U.S. 4, 6, 91 S.Ct. 16, 27 L.Ed.2d 4.

We are satisfied that there are sufficient grounds for the classification made for penalty purposes, and reject the challenges to the statutory treatment of cocaine.

## II

Defendant next argues for reversal on the grounds that the evidence demonstrates outrageous governmental conduct violative of the concept of fundamental fairness and due process. He also maintains that, in any event, the courts should exercise their supervisory powers and bar prosecution in these circumstances to preserve the integrity of federal criminal justice. The defendant says that the trial court erred in overruling two motions presenting these issues.

This argument for dismissal is, of course, interwoven with the entrapment defense which was asserted at trial, submitted to the jury, and rejected by it.[2] The trial judge treated the due process theory based on the conduct of the Government agents as an issue for the court to decide,[3] and, as noted, denied the motions to dismiss on this ground. While arguing that the trial court erred in its rulings rejecting the defense, the defendant does not claim there was error in the issue being ruled on by the court rather than being submitted to the jury. We feel that the trial judge was correct in deciding this issue himself. The question whether circumstances are demonstrated which would bar prosecution under due process principles is for the court. *United States v. Prairie,* 572 F.2d 1316, 1319 (9th Cir.); *United States v. Graves,* 556 F.2d 1319, 1322–23 (5th Cir.), cert. denied, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516; *United States v. Quinn,* 543 F.2d 640, 647–48 (8th Cir.).

The trial court's first ruling on this issue was an oral denial, without elaboration, of a motion to dismiss made at the conclusion of presentation of evidence. (Supp. I R. 3). Six days after the verdict, defendant made a written motion arguing that the prosecution stemmed from introductions made by an informer of the DEA, that the informer's actions were illegal and so outrageous as to violate due process, and that to prevent such conduct from continuing, dismissal of the case and action by the court against the DEA and its agents were necessary in the exercise of the court's supervisory powers. (V R. 44).

This motion was denied by a written memorandum opinion and order of the trial court. (Id. at 45–48). In the memorandum the court noted that the defendant admitted participating in the cocaine transactions, but that his defense was that he had been induced to do so by the undercover agents and the paid informer. The court

---

2. The defendant also claims that the entrapment instruction was in error. We treat this issue in Part III, *infra.*

3. The trial judge rejected a tendered defense instruction on the issue of outrageous conduct. (Supp. I R. 4–5). The court did, however, submit an entrapment instruction. In discussing the entrapment issue in the charge the judge did mention coercion or inducement as an element the jury could consider bearing on whether there was predisposition on the part of the defendant to commit the offense. (Supp. I R. 63, 68).

stated that the informer was recruited while in custody in Gunnison, Colorado, on marijuana charges; that he began to infiltrate the Nederland, Colorado, area in the fall of 1975; that he met the defendant in Nederland; and that defendant attended a party given by the informer and the woman with whom he was living. The court stated further that the undercover DEA agents also attended the party, that defendant invited the agents and the informer to the defendant's residence where he offered them the use of a small amount of cocaine, and that the agents clearly and repeatedly expressed their interest in acquiring large amounts of cocaine.

The court said further that the cocaine involved in the transactions for which defendant was convicted was obtained by defendant from sources other than the paid informer. The court noted testimony by defense witnesses that the informer himself distributed cocaine to other persons, that he attempted to induce these witnesses to use cocaine, and that the informer himself used cocaine in their presence. Most of this testimony related to incidents occurring after the transactions alleged in the indictment. The judge pointed out that the jury was instructed on the issue of entrapment and that there was adequate evidence of predisposition to sustain the Government's burden of proof on this question.

The trial court's memorandum noted that the challenged conduct of the Government informer included not only the use and distribution of cocaine, established by testimony; but that it was also based on an offer of proof concerning what other witnesses would relate as to the informer's fraudulent solicitation of credit, conversion and theft of property, and failure to pay just debts. The latter testimony, however, was said to have been excluded as irrelevant, immaterial and collateral under Rule 403, F.R.E.[4]

Relying on United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366; Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113, and United States v. Spivey, 508 F.2d 146, 149–50 (10th Cir.), cert. denied, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104, the trial court denied the motion to dismiss on the basis of outrageous governmental conduct. The court concluded (V R. 47):

In this case, the questioned conduct had an impact on Mr. Szycher only in providing an introduction of the government's undercover agents as persons ready, willing and able to engage in large volume transactions. Given the defendant's clear predisposition, that is nothing more than providing a favorable opportunity to commit these offenses. If the paid informer is also guilty of illegal acts, the remedy must be something other than the dismissal of these proven charges against this defendant.

■ While the memorandum stated that the court had "no authority or jurisdiction" to grant the motion, we do not believe that the trial judge actually rejected the defendant's motion as one which he had no power to entertain. The court's quotation from Spivey, its analysis of the evidence, and its conclusion quoted above show that the defense was entertained but rejected as lacking in merit.

On appeal, defendant strenuously argues that due process principles require reversal of the trial court's rulings concerning the conduct of the DEA agents and the paid government informer involved in this case. Defendant refers, inter alia, to the statement in Justice Frankfurter's opinion concurring in the result in Sherman v. United States, 356 U.S. 369, 382, 78 S.Ct. 819, 825, 2 L.Ed.2d 848, on conduct falling "below standards, to which common feelings respond, for the proper use of governmental power"; to the statement in the Court's opinion in United States v. Russell, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, that a case may someday be presented in which the conduct of law enforcement agents is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction"; and to statements in the concur-

---

**4.** No claim of error is made as to this evidentiary ruling by the trial judge.

ring and dissenting opinions in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113, discussing this due process theory of defense.

As a factual basis for these contentions Szycher points to (1) the fact that the DEA agents, Barter and Lamberson, hired the informer, Widmark, an individual with a criminal record who was at the time incarcerated in Colorado on drug-related charges and agreed to pay him approximately $300 for each person he could "get into a cocaine situation;" (2) the evidence that after Widmark was so employed, he distributed cocaine to others, induced others to used cocaine, and used cocaine, himself; and (3) the pressure exerted and threats said to have been made to Szycher by the DEA agents to purchase cocaine for them.

We must agree that the theories pressed by the defendant have not been barred by prior decisions and that they are available as defense arguments. The Court's statement in *Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1643, cited above, noted the possibility of such due process defense where "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking the judicial processes to obtain a conviction." A majority of the Supreme Court continues to recognize the possibility of a bar to prosecution imposed under due process principles or as an exercise of the supervisory powers of the courts, in circumstances of sufficiently offensive conduct by law enforcement authorities. See *Hampton, supra*, 425 U.S. at 495, 96 S.Ct. 1646 (Powell, J., concurring in the result); id. at 497, 96 S.Ct. 1646 (Brennan, J., dissenting). Our opinion in *United States v. Spivey, supra*, 508 F.2d at 149, points up the availability of the due process defense in some circumstances:[5]

> We recognize that, under *Russell*, a positive test for 'outrageous conduct' is, by itself, reason enough for the reversal of a

conviction notwithstanding that the defendant was predisposed, and notwithstanding that a criminal otherwise goes free. It is thus that *Russell's* constitutional standard protects the 'sense of justice' referred to in *Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183.

\*  \*  \*  \*  \*  \*

Yet it is clear also that, to be relevant at all, the government's conduct must be postured as connected in some way to the commission of the acts for which the defendant stands convicted. In cases decided since *Russell*, in which constitutional arguments have been raised similar to that here, this connection has been implicitly acknowledged by reference to the extent to which the government instigated, participated in, or was involved or enmeshed in, the criminal activity itself. Thus, the more immediate the impact of the government's conduct upon the particular defendant, the more vigorously would be applied *Russell's* test for constitutional impropriety. (footnote omitted).

It is under these general principles staked out in the Supreme Court's opinions, as well as in the *Spivey* opinion of this court, that we must consider the defendant's due process and supervisory function claims here.

Generally the evidence bearing on the due process and supervisory function theories was as follows: The government's case was based on three deliveries of cocaine by defendant to Richard Barter, an undercover DEA agent posing as a photographer from New Mexico. Defendant first met Barter at a party on April 25, 1976, hosted by the informer, Widmark, who was posing as the son of the actor. Defendant testified that at the party, Widmark told him he wanted defendant to meet two of his friends who were "millionaires." Defendant testified that these agents, Barter and Lamberson, were "pretty hard-looking guys," with ex-

---

5. Other courts have likewise noted the continuing availability of the due process defense. See, e. g., *United States v. Prairie*, 572 F.2d 1316, 1319 (9th Cir.); *United States v. Graves*, 556 F.2d 1319, 1324 (5th Cir.), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516; *United States v. Quintana*, 508 F.2d 867 (7th Cir.); *United States v. Archer*, 486 F.2d 670, 676 n.6 (2d Cir.).

pensive-looking jewelry and black leather jackets.

At the party, Widmark said he wanted some cocaine to "turn on" his friends. Defendant testified that he had a "little cocaine," about half a gram, at his house (III R. 126–28), and that he told Widmark to come over to his house. Barter and Lamberson, as well as Widmark and his roommates, then went with defendant to his house.

Defendant testified that once at his home, he put about half a gram of cocaine on a mirror and everybody "had a little." (Id. at 129). Defendant further testified that during this visit, agent Lamberson asked him if he could get an ounce of cocaine and said that if he would, Lamberson would give defendant a gram out of it. Defendant responded that he was not a cocaine dealer, but then indicated that he would "look around, or something." (Id. at 131).

After several telephone inquiries from agent Barter following the party, defendant did find an ounce of cocaine. Defendant then contacted Barter and arranged a meeting at a restaurant in Boulder on April 26. Before this meeting a gram of cocaine was taken out for defendant, according to his testimony. At the restaurant, defendant gave the cocaine to Barter and in return Barter gave defendant the money ($1800), which defendant passed on to the man who supplied the cocaine. (Id. at 133; I R. 24–26). This transaction was the basis for count one.

Defendant testified that shortly after this first transaction he met Widmark at a club in Boulder. Widmark called defendant into a back room, gave defendant two "small lines" of cocaine, and took two "lines" himself.

Barter testified that on May 4 he telephoned defendant seeking another ounce of cocaine. Defendant later saw Barter and Lamberson at a bar. Defendant testified that at this time Barter was angry because the first ounce had not been good and he had lost money on it. Defendant said he himself was "getting scared." (IV R. 5–6).

He said that he didn't know what would happen to him if he didn't get another ounce for them, and so he told them he would do so to make up for the bad ounce. (Id. at 7).

Defendant later obtained "a little sample" and gave it to Barter at a Boulder restaurant, at which time Barter was accompanied by another undercover DEA agent, Greager. Barter left and field-tested the cocaine (which proved to be 77% pure), returned, and told defendant he liked it and wanted the ounce. (Id. at 8). This transaction at about 3:40 p. m. on May 5 was the basis of count two.

Defendant testified that they then got into his car and drove to Left-Hand Canyon where defendant stopped the car and got the cocaine from his source nearby, ran back to the car and handed it to Barter. Barter gave defendant the money ($1650), which he took back to the supplier, without keeping any for himself. (Id. at 8–9). This transaction formed the basis for count three.

Defendant also testified that for the next three months the undercover agents continued pressuring him to sell them larger and larger quantities of cocaine. He stated that he finally became so frightened that he sought the protection of local law enforcement officers.

This evidence, plus proof concerning Widmark's use of cocaine and his offering the drug to a number of persons in the area, was essentially the basis for the claim of outrageous governmental conduct.

In contrast with pertinent parts of defendant's testimony outlined above, it should be noted that agents Barter and Lamberson denied telling defendant that he could keep a gram out of any cocaine he might obtain for them. (I R. 68–69; II R. 156; IV R. 98). Barter implied in his testimony that the defendant may have gotten some cocaine for himself simply by agreement with his source. (I R. 94–95). The agents also testified that they did not "[have] a little" cocaine with defendant at his home following Widmark's party, as al-

leged by defendant, but instead dumped the proffered sample on the floor when defendant was called away to the phone. (I R. 63, 97–98; II R. 154).

Furthermore, Barter denied threatening the defendant. (II R. 126–27, 130). He said he did tell the defendant that he was "disappointed" and "upset" over the quality of the cocaine first transferred (I R. 28, 96), but he testified that defendant had never acted fearful in all his dealings with the agent. (IV R. 110). Indeed, defendant himself testified that he was "impressed" by Barter and Lamberson when he first met them, and that he had "wanted to make friends with them." (III R. 135–36).

As noted, the trial court in its memorandum opinion discussed the general nature of the evidence and found against defendant. The trial judge found that the questioned conduct merely provided "an introduction of the government's undercover agents as persons ready, willing and able to engage in large volume transactions. Given the defendant's clear predisposition, that is nothing more than providing a favorable opportunity to commit the offenses."

■ We cannot say that the court's findings were clearly erroneous or that there was any error as a matter of law. Government officers can, of course, employ appropriate artifice and deception to ferret out illegal activities. *United States v. Gurule*, 522 F.2d 20, 23 (10th Cir.), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800. Offensive conduct involving threats and coercion could, of course, exceed permissible bounds. Here, however, the conduct by which defendant said he felt threatened was reasonable as being in keeping with the role that Barter had adopted as a purchaser who, as it happened, was cheated on the first delivery of cocaine which proved to be only 9% pure. (I R. 76–77). See *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1339

(9th Cir.). Moreover, the informer's own alleged activities in using and distributing cocaine to others was not sufficiently related to the acts for which defendant was convicted to serve as a bar to this prosecution. See *Spivey, supra*, 508 F.2d at 149.

In sum, we sustain the trial court's ruling that the case not be dismissed on due process grounds or as an exercise of the court's supervisory powers.[6]

### III

■ Lastly, defendant claims error in the entrapment instruction given the jury. He says that the definition as to predisposition was erroneous in that a showing of predisposition requires proof not only of a desire to commit a crime in the nature of the offense charged, but also that absent the involvement of the government in the case, the defendant was still likely to actually commit the crime. This latter point was not covered by the charge, and defendant contends that this omission was reversible error. (Brief of Appellant, 51).

More specifically, defendant points out that the instruction given was directed solely to whether the defendant was "ready and willing," or had the "previous intent or purpose," to commit an offense like that charged. The charge did not focus on the question whether—if the government agents had never known of the defendant's existence—the defendant would have set in motion events resulting in the unlawful distribution of cocaine. Defendant also notes, *inter alia*, that there was no evidence of contemporaneous sales of cocaine by defendant to others; that there were no large quantities of drugs or drug paraphernalia in defendant's possession; that there was no proof that defendant had ever before engaged in the unlawful distribution of cocaine; and that defendant received no mon-

---

**6.** Relying on *Heath v. United States*, 169 F.2d 1007 (10th Cir.), and similar cases, defendant also says there was fatal error in the government's use of the undercover agents to develop the case because they had no reasonable basis for believing he was engaged in criminal activity when the undercover procedures began.

See also *Ryles v. United States*, 183 F.2d 944 (10th Cir.), *cert. denied*, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 637. We have recently rejected this theory and overruled *Heath* and *Ryles* in this respect. *United States v. Swets*, 563 F.2d 989, 991 (10th Cir.).

etary profit. Defendant says that in view of these factors the jury could well have concluded, if properly instructed, that despite a desire on his part to distribute cocaine, he was unlikely to do so, absent the agents' actions. Timely objection was made to the entrapment instruction.

We cannot agree with the defendant's position. We feel that the instruction as given [7] was sufficient and covered the essence of entrapment as outlined in *Sorrells v. United States*, 287 U.S. 435, 441–42, 53 S.Ct. 210, 77 L.Ed. 413; *Sherman v. United States*, 356 U.S. 369, 372–73, 78 S.Ct. 819, 2 L.Ed.2d 848, and *United States v. Russell, supra*, 411 U.S. at 428–29, 93 S.Ct. 1637. See also *United States v. Lane*, 574 F.2d 1019, 1022 (10th Cir.); *United States v. Swets, supra*, 563 F.2d at 990; *United States v. Gurule, supra*, 522 F.2d at 23, 25; *United States v. Shaw*, 570 F.2d 770 (8th Cir.); *United States v. Pena-Ozuna*, 511 F.2d 1106 (9th Cir.), *cert. denied*, 423 U.S. 850, 96 S.Ct. 92, 46 L.Ed.2d 73. Adding a statement such as defendant suggests would seem to saddle the government with a further burden not contemplated by the Supreme Court's opinions. Defendant's arguments as to the lack of evidence on certain points are valid factual contentions on the issue of predisposition; however, this question was properly submitted to the jury and decided against defendant and the verdict is not without support in the record.

We conclude that no ground for reversal is shown and accordingly the judgment is AFFIRMED.

---

7. The instruction on entrapment read, in pertinent part as follows (Supp. I R. 67–68):

Now, the defendant asserts that he was a victim of entrapment as to the crime charged in the Indictment.

Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, he is a victim of entrapment, and the law, as a matter of policy, forbids his conviction in such a case.

On the other hand, where a person already has the readiness and the willingness to commit an offense, the mere fact that Government agents provide what appears to be a favorable opportunity to do so, is not entrapment.

Thus, it is not entrapment for a Government agent merely to pretend to be someone else and to offer to purchase narcotics.

If the jury should find beyond a reasonable doubt from the evidence in the case that

before anything at all occurred respecting the alleged offense involved in the case, the defendant was ready and willing to commit crimes such as charged in the Indictment whenever opportunity was afforded, and the Government officers or their agents did no more than offer the opportunity, then the jury should find that the defendant is not a victim of entrapment.

On the other hand, if the evidence in the case should leave you with a reasonable doubt, whether the defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or the persuasion of some officer or agent of the Government directly or indirectly, then it is your duty to acquit him.

This instruction substantially followed the standard entrapment instruction in *Devitt* and *Blackmar*, Federal Jury Practice and Instructions, § 13.09 (1977).