John Arthur WAGER, Appellant,

v.

Maynard J. PRO.

John Arthur WAGER

v.

Maynard J. PRO, Appellant, (two cases.)

Nos. 78–1444 to 78–1446.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 26, 1979.

Decided July 27, 1979.

Kenneth M. Raisler, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and William H. Briggs, Jr., Asst. U. S. Attys., Washington, D.C., were on brief, for appellant in Nos. 78–1445 and 78–1446 and appellee in No. 78–1444.

Ed Wilhite, Washington, D.C., for appellee in Nos. 78–1445 and 78–1446 and cross appellant in No. 78–1444.

Before WRIGHT, Chief Judge, MacKINNON, Circuit Judge, and AUBREY E. ROBINSON, Jr.,* United States District Court Judge for the District of Columbia.

Opinion for the Court filed by MacKINNON, Circuit Judge.

MacKINNON, Circuit Judge:

In his complaint commenced in the Superior Court of the District of Columbia in 1973 Wager alleged that Pro was grossly negligent in ordering Wager to solicit a bribe from a defendant in a pending criminal case in which some of the evidence was

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

then being examined by the Alcohol, Tobacco and Firearms Laboratory. Pro had the case removed to the United States District Court for the District of Columbia pursuant to 28 U.S.C. §§ 1442(a) and 1446 which furnishes the basis for federal jurisdiction. The District Court initially disposed of the case on summary judgment for Pro, finding that Wager and Pro were *in pari delicto. Wager v. Pro*, 391 F.Supp. 752 (D.D.C.1975). This Court reversed the summary judgment and remanded to the District Court. We find that two genuine issues of material fact existed based on the then record: (1) was the bribery scheme illegal or immoral, and (2) was Wager less at fault than Pro, assuming the illegality or immorality of the scheme. *Wager v. Pro*, 188 U.S.App.D.C. 1, 575 F.2d 882 (1976). The case was submitted to a jury, which returned a verdict for Wager in the sum of $3,360 plus costs. Both parties appeal this judgment.

I.

We set forth the facts most favorable to Wager, the prevailing party, but do not intend thereby to ignore the fact that Pro offered evidence that materially contradicted that of Wager. We express no opinion as to where the truth lies.

John A. Wager retired from the military in September, 1969. After numerous and varied short term jobs, Wager was hired in February, 1970 by Maynard J. Pro as a GS–5 Handwriting Analyst Trainee in the Alcohol, Tobacco and Firearms Laboratory (ATF) in Washington, D. C. Wager was to be trained to become a handwriting analyst. (Tr. 189–90). The sole function of the laboratory was to examine evidence such as handwriting samples. It had no criminal investigative powers or responsibilities (Tr. 150, 160).

Wager testified that on July 23, 1970 Pro discussed the pending Angelo Bruno case with him. The Bruno case was scheduled to go to trial in September, 1970, and ATF was performing certain document examinations in connection with that case. According to Wager, Pro told him how important the Bruno case was to the laboratory, but that the government evidence against Bruno was very weak. Pro then asked him to go to Philadelphia to see if he could induce Mr. Copper-Smith (Bruno's accountant and a defendant in the Bruno case) to bribe Wager. Pro was allegedly attempting to "get these people on something else." (Tr. 21)

Wager explained to Pro that he believed this act would constitute entrapment, which he considered to be immoral. However, because he was only a probationary employee, Wager claims he decided to go along with the scheme. They determined that Wager would give the individuals involved in the Bruno case worthless evidence to "drive them up the wall." (Tr. 22) Wager was instructed to let Copper-Smith know he was willing to accept money in return for the worthless information.

On the day following this conversation, Wager flew to Philadelphia and called Copper-Smith, who happened to be out of town. After failing to contact Copper-Smith Wager determined on his own that he should contact one of the other defendants in the Bruno case. Since he had forgotten their names, he went to the city's main library and researched the case. Upon finding a newspaper article regarding it, Wager got the name of an attorney who was a defendant in the case, a Mr. Levin. Wager then contacted Levin, met with him and told him how weak the defendant's case was. He offered to let him have the worthless ATF information. Levin told Wager he would get back to him on the matter.

Wager later made several calls to Levin, and then finally called Levin's attorney, Mr. Lorry, who asked Wager to send him some of the laboratory's evidence. Wager sent him a non-sensitive newsletter involving laboratory activities. Pursuant to another phone conversation with Mr. Lorry, Wager sent additional worthless evidence along with a letter requesting a $15,000 loan.

On August 18, 1970, Pro asked Wager to accompany him to the office of the Director of ATF. Wager testified that on the way to the office, Pro instructed Wager not to say anything about the scheme and Pro

would handle it. Wager agreed not to say anything. In the Director's office Wager was arrested and later indicted on two counts of soliciting a bribe. Wager never explained the scheme to the police, and Pro never came forward with any information.

ATF terminated Wager from his position in August, 1970. He was tried in 1972 on the charge of soliciting a bribe and was acquitted by the jury. Wager contended that when Pro testified in Wager's criminal trial, he denied knowing anything about the scheme.

Wager testified that he believed the scheme was stupid and morally wrong, but not illegal. He knew he was enticing people to break the law, but he assumed Pro had the authority to order this. Wager opined that his action of sending worthless information to Levin would have side-tracked the defense in the Bruno case, and caused Levin to put on a defense that was patently wrong. (Tr. 90)

Raymond E. Makowski, prosecutor for the Department of Justice in the criminal case against Wager, testified that the scheme of a government official contacting defendants in an ongoing case in the hope of entrapping that individual into bribing the official constituted governmental misconduct. This would especially be true where contacting a defendant in a criminal case was completely outside the powers and responsibilities of the laboratory.

Donald Bacon, former Assistant Commissioner of Compliance for the Internal Revenue Service testified that Wager's scheme was "completely unheard of and highly improper." (Tr. 152) The ATF laboratory had no independent investigative functions, and no direct contact with defendants in pending investigations. Such a scheme, had it been successful, would have destroyed the laboratory's reputation.

Rex Davis, former Acting Director of ATF, also testified as to the impropriety of Wager's actions, noting that it was the clearest kind of entrapment and clearly outside the scope of the laboratory's activities.

## II.

This is a very difficult case to treat as a negligence case because of the obvious intentional criminal conduct involved in the bribery scheme. When the trial court first disposed of the case on a motion for summary judgment, it did not reach the issue as to the basic nature of the tort, i.e. whether the plaintiff Wager stated a cause of action for gross negligence. Instead, it relied on the common-law principle that parties to an illegal or immoral transaction may not seek redress in a court for wrongs suffered as a result of the transaction. *Wager v. Pro*, 391 F.Supp. at 754. This is clearly the law in the District of Columbia for both tort and contract actions. *See Hunter v. Wheate*, 53 App.D.C. 206, 289 F. 604 (1923). The trial court impliedly determined that the bribery scheme was illegal and immoral, thus precluding Wager's recovery from Pro because they were *in pari delicto*.

On appeal, this Court likewise concentrated on the illegality and immorality and *in pari delicto* issues. We reversed and remanded the case holding that whether an alleged entrapment scheme is illegal is a question of fact which involves the defendant's predisposition to commit crimes of the kind solicited. *Wager v. Pro*, 188 U.S.App. D.C. at 3, 575 F.2d at 884; *Sherman v. United States*, 356 U.S. 369, 382, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). We also determined that a finding that the parties were *in pari delicto* was not a complete defense. Instead, it triggers the question of whether one party was less at fault than another. If the answer to that question is affirmative, then it is still possible for the party less at fault to recover from the other. *Wager v. Pro*, 188 U.S.App.D.C. at 3-4, 575 F.2d at 884-85.

On remand, the trial court refused the defendant's request to instruct the jury as to the illegality of the bribery scheme. It submitted the question to the jury, instructing that if it found the parties' actions to be illegal or immoral, it should then decide the issue of comparative fault to determine Pro's ultimate liability. Pro appealed the trial court's action, arguing that it commit-

ted prejudicial error by not instructing the jury as to the illegality and immorality of the scheme. In so doing, the trial court allowed the jury to avoid deciding the comparative fault issue identified by this Court. After examining all of the evidence presented at trial, we agree with Pro and thus reverse and remand the trial court's judgment.

### III.

This Court recently recognized that the entrapment defense in criminal trials is normally a jury question as to the defendant's predisposition to commit the crime. *United States v. Burkley*, 192 U.S.App.D.C. 294, 302, 591 F.2d 903, 911 (1978). However, we recognized the long-standing controversy in the Supreme Court on this issue, culminating in its most recent enunciation on the issue in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). In *Hampton,* the divided majority held that for the government to supply contraband does not constitute entrapment *per se*, and that the issue of the defendant's predisposition must be submitted to the jury. However, two of the five member majority stated that their opinion would not necessarily extend to situations where there is a demonstrable level of outrageous governmental conduct in the entrapment scheme.[1] The result under those circumstances had likewise been left undecided in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

The Fifth Circuit addressed the issue of entrapment *per se* when there is governmental misconduct in *United States v. Graves*, 556 F.2d 1319 (5th Cir. 1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978). The *Graves* Court up-

held the trial court's entertainment of the defendant's pretrial motion to dismiss on the ground of governmental misconduct. The case concerned actions by various Federal Housing Administration officials who were so involved in the corruption alleged that the government should be precluded from bringing the prosecution. The Court determined that this question was one for the court, not the jury. It cited a similar ruling by the Eighth Circuit.

> [G]overnmental participation may be so outrageous or fundamentally unfair as to deprive the defendant of due process of law or to move the courts in the exercise of their supervisory jurisdiction over the administration of criminal justice to hold that the defendant was "entrapped" as a matter of law . . . (citation omitted) A claim of entrapment on the basis of outrageous government involvement does not present any question for a jury to decide but solely a question of law for the court.

*United States v. Quinn*, 543 F.2d 640, 648 (8th Cir. 1976). *See also United States v. Szycher*, 585 F.2d 443, 445 (10th Cir. 1978); *United States v. Prairie*, 572 F.2d 1316 (9th Cir. 1978).

■ The conduct of Pro and Wager in their bribery solicitation scheme was so outrageous that the trial court, upon reviewing all the evidence, should have instructed the jury as to the scheme's illegality. Entrapment, normally recognized as a defense in criminal cases, can be so outrageous as to be illegal because it deprives the defendant of due process of law.[2] All of the witnesses testifying on this issue, including Wager, agreed that Wager's actions constituted the clearest form of entrapment where abso-

---

1. In *Burkley*, we determined that

    For our purposes, the importance of *Hampton* is that once again five Justice accepted the view that, in those instances in which "[p]olice overinvolvement in crime" does not "reach a demonstrable level of outrageousness," predisposition is the dispositive issue. *United States v. Burkley*, 192 U.S.App.D.C. at 302, 591 F.2d at 911, *citing Hampton v. United States*, 425 U.S. at 495 n.7, 96 S.Ct. 1646 (Powell, J., joined by Blackmun, J. concurring).

2. The Court is not presuming to designate entrapment by outrageous governmental misconduct as an independent crime which may be prosecuted in criminal court. However, such conduct may certainly be deemed "illegal" where the claim is made in a tort case that the parties who have no law enforcement authority or responsibility are *in pari delicto*.

lutely no predisposition was claimed to exist. Wager stated that he believed the scheme to be immoral, and stupid. He also opined that the worthless evidence sent to Levin was meant to sidetrack his defense in the pending Bruno case. The purpose according to Wager was obviously to confuse the defendants and weaken their presentation in that case. An attorney for the Department of Justice stated that this scheme constituted governmental misconduct. He also commented that had the full scope of the scheme been evident, i. e. Pro's involvement, he would have recommended filing other criminal charges against both Wager and Pro.[3] Other terms used during the trial to describe the scheme were "completely unheard of", "improper", and "outside the scope of ATF's authority." Finally, it is noteworthy that Wager failed to introduce one iota of evidence at trial to rebut the above conclusions of misconduct, or to exhibit the legality of the scheme.

■ The evidence at trial, therefore, is so clear that Wager and Pro were involved in an illegal scheme as a matter of law, that the jury should have been so instructed on this issue. By allowing the jury to determine the illegality question, it may never have reached the comparative fault issue.

The Court recognizes that its holding in this case is extremely narrow. We are not going so far as to say that in criminal cases a court may designate a similar scheme entrapment *per se*. That issue is still left open after *Burkley*. However, in a civil tort case where the issue of whether a

particular act was illegal or immoral so as to present the *in pari delicto* defense, the Court should instruct the jury, where plaintiff's claim is as clear as here, that the outrageous misconduct of those without any law enforcement authority in setting up an entrapment scheme is illegal. Thus, the case is reversed and remanded.

## IV.

We also find that Wager simply has not made out a cause of action for gross negligence. After reviewing all of the evidence presented at trial, it is clear that if a tort action arises from this bribery scheme at all, it is an intentional tort.

■ To demonstrate the distinction between intentional and negligent torts, it is essential to look at the very most basic definitions of both. "Intent", as it is used in intentional torts, has been defined as the desire to bring about a result that will invade the interests of another. W. Prosser, *Law of Torts* § 8, at 31 (1971). In contrast, gross negligence implies an "extreme departure from the ordinary standard of care." *Id.* at 184. Dean Prosser elaborated on the differences between intentional and negligent tortious acts.

In negligence, the actor does not desire to bring about the consequences which follow, nor does he know that they are substantially certain to occur, or believe that they will. There is merely a risk of such consequences, sufficiently great to lead a reasonable man in his position to anticipate them, and to guard against them.

3. Prosecutor Makowski concluded that such conduct would possibly constitute an obstruction of justice or a violation of the defendant's civil rights under 18 U.S.C. § 241. See Trial Transcript, February 27, 1978, at 124–25.

This Court also notes the possibility that Wager and Pro violated 18 U.S.C. §§ 1503 and 18 U.S.C. § 371. The interference with a pending criminal trial bears some similarity to the offense charged in the indictment to which Charles Colson plead guilty in 1974, *United States v. Charles Colson*, Crim.No. 74–116, United States District Court for the District of Columbia. The information against Colson charged him with "devising and implementing a scheme to defame and destroy the public image and credibility of Daniel Ellsberg with

the intent to influence, obstruct, and impede the conduct and outcome of the criminal prosecution then being conducted in the United States District Court for the Central District of California." [Against Ellsberg]. Ellsberg was being tried under indictment in *United States v. Russo*, Crim.No. 9373 in the United States District Court for the Central District of California. Colson was also charged with having "endeavored to and did release defamatory and derogatory allegations concerning one of the attorneys engaged in the legal defense of Daniel Ellsberg for the purpose of publicly disseminating said allegations, the known and probable consequences of which would be to influence, obstruct, and impede" Ellsberg's trial.

If an automobile driver runs down a man in the street before him, with the desire to hit him, or with the belief that he is certain to do so, it is an intentional battery; but if he has no such desire or belief, but merely acts unreasonably in failing to guard against a risk which he should appreciate, it is negligence.

*Id.* at 145.

■ It is clear that Wager's allegations regarding Pro's instigation of the bribery scheme, if taken as true, exhibit an intent on Pro's part to bring about the consequences. Or at least it could be said that he was substantially certain that they would occur. According to Wager, Pro intended him to solicit the bribe from the Bruno defendants. He intended that Wager should perform this task entirely on his own, since he directed Wager to say nothing to others in the ATF office and to the police. And, more importantly, he intended Wager to take the entire blame for his acts. Pro's failure to come forward and describe his connection with the scheme at the time of Wager's arrest certainly can not be described as a negligent act, or as a failure to act with due care. According to the plaintiff's contentions Pro intended that Wager should take the full blame for the bribery scheme when he remained silent about his participation during Wager's criminal prosecution, and when he allegedly committed perjury on the stand by denying any knowledge of the scheme.

Therefore, because Pro's actions were intentional from start to finish, as were his desires to bring about the consequences to the Bruno defendants and to Wager, they should be described as an intentional tort.

## V.

■ The trial court instructed the jury, over the defendant's objection, on the issue of last clear chance. Since this doctrine only applies to negligence torts, it should not be applied in the instant case, involving an intentional tort. Thus, the trial court committed prejudicial error when it instructed the jury on the last clear chance doctrine.

■ Even if this were a negligence case, we do not consider it an appropriate kind of case to apply the doctrine. The Court agrees with the reasoning of the Ninth Circuit in *County of Maricopa v. Maberry*, 555 F.2d 207, 210–17 (9th Cir. 1977), which notes that only a few cases have attempted to apply the doctrine to non-mechanical instrumentality cases, and all were reversed on appeal. The doctrine was originally designed for negligence cases involving mechanical instrumentalities like automobiles.

In addition, the doctrine is often criticized because it "merely transfers from the plaintiff to the defendant an entire loss due to the fault of both." W. Prosser, *Law of Torts* § 66, at 428 (1971). Although we recognize that the last clear chance doctrine is the law in this Circuit in negligence cases, *Bowman v. Redding & Co.*, 145 U.S.App. D.C. 294, 300–01, 449 F.2d 956, 962–63 (1971) *rehearing* 145 U.S.App.D.C. 316, 449 F.2d 968, it really is inapplicable to an intentional tort and it would be error to apply it in the instant case, because it would greatly confuse the jury when applied with the *in pari delicto* and comparative fault defenses.

## VI.

■ Finally, Wager cross-appealed on the issue of whether the trial court was in error by refusing to permit the jury to award punitive damages. It is clear that Wager could not be awarded such damages in a recovery based on gross negligence. In *Knippen v. Ford Motor Co.*, 178 U.S.App. D.C. 227, 236–37, 546 F.2d 993, 1002–03 (1976) we said that gross negligence will not support punitive damages, since "[t]he most extreme negligence lacks the essential element of conscious indifference to consequences." *Id.*

However, since we have determined that this case must be brought as an intentional tort, if the case is presented to the jury an award of punitive damages would not be denied because of the nature of the action. See *Id.*; *Nader v. Allegheny Airlines, Inc.*, 167 U.S.App.D.C. 350, 372–73, 512 F.2d 527,

549–50 (1975), *rev'd on other grounds*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976).

In conclusion, we find that the trial court committed prejudicial error by not instructing the jury as to the illegality of Wager and Pro's bribery scheme. In addition, Wager failed to prove a cause of action for gross negligence, since Pro's actions, if Wager's allegations are taken as true, constituted an intentional tort. For this reason, the court's instruction to the jury on the last clear chance doctrine also constituted error. Finally, we affirm the trial court in refusing to allow the jury to consider an award of punitive damages, a form of recovery which would not be prevented in an intentional tort case if the facts otherwise allowed it. We therefore reverse and remand for proceedings not inconsistent with this opinion.

*Judgment accordingly.*