Bowling R. GREGORY, Personal
Representative of the Estate of
David F. Gregory, Appellant,

v.

GREATER SOUTHEAST COMMUNITY
HOSPITAL CORP. and Manoucher
Sadri, M.D., Appellees.

No. 95–CV–1258.

District of Columbia Court of Appeals.

Argued Dec. 10, 1996.
Decided July 24, 1997.

Frederick Harrison Collins, Washington, DC, for appellant.

Thomas M. Hogan, Washington, DC, for appellee Greater Southeast Community Hospital Corp.

Alfred F. Belcuore, with whom Thomas C. Mugavers and Stephen L. Altman, Washington, DC, were on the brief, for appellee Manoucher Sadri, M.D.

Before WAGNER, Chief Judge, FARRELL, Associate Judge, and PRYOR, Senior Judge.

FARRELL, Associate Judge:

David Gregory, then thirty years old, was admitted to Greater Southeast Community Hospital (Greater Southeast or the Hospital) unconscious after overdosing on a combination of drugs, including heroin. He died eleven days later when, still in the hospital, he injected himself with illegal drugs he had obtained by unknown means. This appeal presents solely an issue of causation. The defendants/appellees concede that there was evidence from which the jury fairly could find that Greater Southeast and Dr. Sadri, the evaluating psychiatrist, were negligent in not initiating the Hospital's Opioid Detoxification Protocol in treating Gregory. The issue, rather, is whether there was evidence reasonably permitting the plaintiff's medical expert to opine that the second, fatal, overdose was proximately caused by this negligence as the non-volitional result of an untreated craving for heroin. The trial court concluded that the expert's opinion on causation lacked an adequate foundation as a matter of law. We uphold the grant of a directed verdict in favor of the defendants.

## I.

Gregory was admitted to Greater Southeast on May 26, 1992, after being found unconscious in the restroom of a gas station. The admitting diagnosis was "respiratory failure, possibly aspiration, unresponsive"; he was determined to be in a "post-overdose [condition] on different medications," including cocaine, amphetamines, benzodiacepines, and heroin. A psychiatric evaluation was performed and he was transferred to the Psychiatric Floor, where for the next eleven days he received therapy and medications for anxiety, agitation, depression, withdrawal symptoms, and out-of-control behavior. On June 7, 1992, he was found unconscious on the bathroom floor of his hospital room; he had injected himself with illegal drugs procured by unknown means, and was pronounced dead of acute intravenous narcotism, a state of stupor induced by a narcotic.

Interviews with Gregory and his family, as well as hospital records, established that he had a history of abusing drugs, including heroin, starting with his senior year of high school in 1980. While attending college from 1988 to 1991, he attended nightly meetings of Narcotics Anonymous or Alcoholics Anonymous. He apparently remained drug free until February 1991 when he relapsed following unrelated surgery. He abused the prescription drugs prescribed following the surgery, and "as time went on, it became cocaine and heroin." Between March 1991 and May 26, 1992, he took part in drug rehabilitation and detoxification programs without lasting success, including one in March of 1992 at the Psychiatric Institute of Washington. At the time of his admission to Greater Southeast, he was under the care of a psychiatrist and receiving medication. He told Dr. Sadri that he had first attempted suicide in 1985, and that "this"—the latest overdose—was his "fifth or sixth time that he had attempted suicide."

Plaintiff's medical opinion expert, Dr. Resnik, offered an opinion that at the time of admission to the hospital Gregory had a "polysubstance abuse" problem and that he was a "chronic abuser" particularly of "opiolates[,] highly addictive drugs." These opioids, a "generic, ... broad description"

for heroin, are "the most common cause for detoxification," a regimen of managed withdrawal using substances such as Methadone. A "concomitant of [such] withdrawal" is a craving or "yearning" for the drug. In Dr. Resnik's opinion, the defendants' failure to institute Greater Southeast's Opioid Detoxification Protocol as to Gregory violated the standard of reasonable care. Resnik also opined, within a reasonable degree of medical certainty, that had Gregory been treated according to the protocol he would not have overdosed again on June 7, 1992 while in the hospital, "[b]ecause he would have been on a withdrawal from opioid [yearning] and a maintenance against his opioid yearning." Dr. Resnik's opinion was that, had Gregory "been properly withdrawn, the craving would have been controlled [and] diminished, and not uncontrol[l]able and as driving as it was." That craving was foreseeable to the Hospital and Dr. Sadri in light of Gregory's previous "detoxifications, his failed programs, his abuse of the heroin, ... the presence of the opioids" in his system at the time of admission, and his behavior and mood swings in the hospital that were symptomatic of heroin withdrawal.

## II.

 "Ordinarily, in a medical malpractice case, expert testimony is required in order to prove ... causation." *Gordon v. Neviaser,* 478 A.2d 292, 295 (D.C.1984) (quoting *Sponaugle v. Pre–Term, Inc.,* 411 A.2d 366, 368 (D.C.1980)). Plaintiff concedes that Dr. Resnik's opinion was essential to its proof of proximate causation. "Proximate cause is 'that cause which, in natural and continual sequence, *unbroken by an efficient intervening cause,* produces the injury....'" *Powell v. District of Columbia,* 634 A.2d 403, 407 (D.C.1993) (emphasis added; citations omitted). The trial court concluded that plaintiff had failed as a matter of law to prove the necessary sequence: that Gregory's injecting himself with drugs in the hospital was not the voluntary, efficient intervening cause that produced his death. For the same reason, the court determined that Gregory was contributorily negligent as a matter of law. The court found insufficient

evidence in the record to support a reasonable conclusion by Dr. Resnik that Gregory, absent the detoxification which should have been instituted, was in the grip of an uncontrollable yearning for heroin that robbed him of the capacity to resist obtaining and injecting it if he could do so undetected.

■ In our judgment, too, the record is insufficient to support a reasonable inference that Gregory had lost all volition and so was powerless to resist the yearning for opioids. What might be termed the cognitive aspect of volition is not disputed. Gregory's prior history of overdosing was enough to impute to him as a matter of law knowledge of the risk of death from doing so yet again. Central to the case, then, is Dr. Resnik's opinion that, despite such knowledge, Gregory's dependency on opioids was of such magnitude that, if untreated, it would foreseeably cause him to seek out and use them as he did.[1] Critically, however, Dr. Resnik acknowledged in his testimony that persons using opioids have varying degrees of dependency on them, and that to determine an "individual's degree of dependence" and thus the magnitude of his craving during withdrawal, one would need to know

[h]is prior use of the opioids, the frequency with which he used it, how he used it, whether he had been treated for it in the past, how many times, how successful that treatment has been, what has been the nature of the treatment, and the time ... frame, the duration, the intervals.

These factors, in particular "the amounts" and "[t]he strength of the opioids" the individual had been taking, "would be a great determin[a]nt in [establishing] the magnitude and the different kinds of [withdrawal] systems [sic; symptoms] he would have."

Yet, on cross-examination, Dr. Resnik admitted that he did not "know how frequently or in what quantity Mr. Gregory was using heroin [or opioids] during the several months before his admittance to Greater

Southeast." He did not know "how frequently [Gregory] used opioids" either at the time of or "after his ... March 1992 Psychiatric Institute admission." He had not reviewed the records of Gregory's admission to the Psychiatric Institute or, indeed, the records of any of "his inpatient admissions to drug rehabilitation programs preceding his May 26th admission to Greater Southeast Hospital." Although the doctor knew that Gregory had been treated with antidepressants and tranquilizer medications by Dr. Roth of the Psychiatric Institute, he did not know the frequency or "intensity" of this treatment. Regarding the three-month period between March and May 26, 1992, Dr. Resnik was asked:

[S]ince you don't know how much heroin he was using during that period of time, you cannot state within a reasonable degree of medical probability that he would have gone through withdrawal symptoms; isn't that correct?

He answered: "I cannot."

In short, Dr. Resnik lacked information he himself said was necessary in determining whether Gregory's craving for drugs was so powerful that he was unable to resist it. What Dr. Resnik knew, in essence, was that Gregory "was known to have abused different drugs in the past 10 to 12 years" without lasting success at detoxification, that he had "recently"—without greater precision—"been reusing" opiates according to his family, and that an overdose on a combination of drugs had brought him to Greater Southeast Hospital on this occasion where he then showed symptoms of withdrawal.[2] This knowledge fails to permit a jury conclusion on other than surmise that Gregory was so driven by addiction that he could not help but commit the act that took his life. While Dr. Resnik may have been correct that "there was enough presumptive evidence at the time [Gregory] was admitted to [require the Hos-

1. Dr. Resnik rejected the hypothesis that Gregory's fatal overdose was a deliberate act to take his life, since by that time Gregory "was no longer suicidal."

2. Even as to the symptoms he exhibited of "agitation, ... restlessness and ... irritability," how-

ever, Dr. Resnik could not say "within a reasonable degree of medical probabilities ... whether or not these are related to his withdrawal from opioids or ... to behavioral problems unrelated to the use, or withdrawal of opioids."

pital] to put him on the [opioid] withdrawal program," that opinion goes to the issue of negligence, not causation. The "presumptive evidence" of negligence did not also support a conclusion that Gregory so lacked volition that he could not be held at fault for his own death.

Our disposition makes it unnecessary to consider appellees' reliance on the principle that a party to "an illegal ... transaction may not seek redress in a court for wrongs suffered as a result of the transaction." *Wager v. Pro*, 195 U.S.App. D.C. 423, 426, 603 F.2d 1005, 1008 (1979); *see also Olverson v. Olverson*, 54 App. D.C. 48, 49, 293 F. 1015, 1016 (1923). We would be reluctant to hold that Gregory's resort to illegal drugs (either previously as the cause of his asserted addiction or while in the hospital) barred his estate from seeking redress at all for the asserted failure to treat him. Nor need we decide whether the unlawful nature of his conduct at least should have required a showing of fault by the defendants greater than ordinary negligence. *Cf., e.g., Murdock v. City of Keene*, 137 N.H. 70, 623 A.2d 755, 756–57 (1993) (in case of suicide attempt by prisoner, jailer's failure to prevent the attempt may be actionable as "an equal or greater cause of the prisoner's injuries" only when "a prisoner's injuries are proximately caused by a jailer's *reckless disregard* for the prisoner's safety" (emphasis added)). Nevertheless, the fact that the criminal law would not excuse Gregory's use of unlawful drugs (had he survived) at least admonishes us to look carefully at the evidence offered to prove, as plaintiff had to, that Gregory retained no self-control at all and thus could bear no civil responsibility for causing his death. Since that evidence was wanting here as a matter of law, the judgment of the trial court is

*Affirmed.*

WAGNER, Chief Judge, dissenting:

Plaintiff's evidence, viewed in its most favorable light, was sufficient to require submission of the questions of proximate cause and contributory negligence to the jury. *See Rich v. District of Columbia*, 410 A.2d 528, 532 (D.C.1979). Dr. Resnik, plaintiff's medical expert, testified, to a reasonable degree of medical certainty, that the defendants' negligence in evaluating and treating the decedent, David Gregory, was a proximate cause of his death.[1] Contrary to my colleagues, it is my view that Dr. Resnik's expert opinion on causation had an adequate foundation in the record to support it.

Although Dr. Resnik did not know how much heroin Gregory used between March and May 26, 1992, he did know that Gregory was a "chronic abuser" of "opialates[,] highly addictive drugs," which had contributed to his overdose on May 26, 1992 and his admission to Greater Southeast Community Hospital in an unconscious state from a drug overdose. He knew that Gregory's behavior in the hospital was consistent with opioid withdrawal and the attendant cravings. Gregory's history and condition conformed to the "profile" of patients whom Dr. Resnik had treated, and who, without treatment and maintenance against opioid craving, experienced "an uncontrollable yearning for [those] substances."

Dr. Resnik testified that Gregory displayed symptoms of withdrawal, *i.e.*, restlessness, agitation, bizarre and psychotic behavior, sleeplessness, grandiose ideas, and loss of temper. Thus, while Dr. Resnik did not know the frequency or quantity of Gregory's drug use just prior to admission to the hospital, other factors formed a foundation for his expert opinion. The hospital records showed that Gregory was a chronic drug user for over ten to twelve years and that he failed in his attempts at rehabilitation. Based upon the considerable information available to Dr. Resnik and his extensive expertise, it was Dr. Resnik's opinion that Gregory was suffering from withdrawal and an uncontrollable craving for drugs and that it was foreseeable that he would attempt to

---

1. Specifically, Dr. Resnik expressed opinions to a reasonable degree of medical certainty that: (1) defendants' "failure to institute those treatments, resulted in [the decedent's] ongoing opioid seeking and opioid yearning; and (2) [decedent] would not have overdosed" on the date of his death if he had "been on a withdrawal from opioid training and a maintenance against his opioid yearning."

alleviate that craving by obtaining drugs, if not treated. Thus, Dr. Resnik's opinion furnished a rational basis on which the jury could find that Gregory's seemingly volitional act of injecting himself again with drugs was a compulsive, involuntary result of his addiction to opioids.

Except in rare cases, the issues of negligence, proximate cause, and contributory negligence are questions of fact for the jury. *See District of Columbia v. Freeman,* 477 A.2d 713, 716 (D.C.1984). The issue of proximate causation must be submitted to the jury unless the evidence permits only one rational answer to the question. *Id.* To sustain the directed verdict here, it would have to be determined that "only one conclusion reasonably [can] be drawn from the evidence" on causation: that Gregory's drug overdose which resulted in his death was a voluntary act that severed any causal link between the defendants' negligence and decedent's death. *See, e.g., Powell v. District of Columbia,* 634 A.2d 403, 407 (D.C.1993) ("Proximate cause is 'that cause which, in natural and continual sequence, *unbroken by any efficient intervening cause,* produces the injury....'") (emphasis added; citations omitted). When the evidence is viewed in the light most favorable to plaintiff, Gregory, as it must be, such a determination cannot be made. There was evidence, as above-described, from which the jury could find that Gregory was incapable of exercising reasonable care for his own safety and that he did not have the conscious ability to resist the ingestion of drugs which led to his death. Such evidence, if accepted by the jury, would establish proximate cause, *see id.,* and defeat a claim of contributory negligence as well. *See Psychiatric Inst. of Washington v. Allen,* 509 A.2d 619, 627 n. 11 (D.C.1986); *see also District of Columbia v. Peters,* 527 A.2d 1269, 1275 (D.C.1987). For these reasons, I am persuaded that the trial court erred in granting a directed verdict for the defendants. Therefore, I respectfully dissent from the opinion of the court.