**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James C. SPIVEY,
Defendant-Appellant.**

**No. 74–1140.**

United States Court of Appeals,
Tenth Circuit.

Submitted Sept. 12, 1974.

Decided Jan. 6, 1975.

Certiorari Denied April 28, 1975.

See 95 S.Ct. 1682.

Hugh A. Burns, Denver, Colo. (Pamela A. Ray and Dawson, Nagel, Sherman & Howard, Denver, Colo., on the brief), for defendant-appellant.

Arthur H. Bosworth, Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty., Denver, Colo., on the brief), for plaintiff-appellee.

Before LEWIS, Chief Judge, SETH, Circuit Judge, and CHRISTENSEN *, District Judge.

LEWIS, Chief Judge.

James C. Spivey was charged in a two-count indictment returned against him and another, with knowingly and intentionally distributing heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Following a jury trial in the United States District Court for the District of Colorado, at which trial his sole defense was entrapment, Spivey was convicted on both counts and was sentenced to concurrent terms of six years' imprisonment on each count. Spivey now appeals from the resultant judgment, contending principally that the evidence established the defense of entrapment as a matter of law and that, in the event such defense was not so established and

* Sitting by designation.

maintained, the conduct of a government informer was so outrageous as to be violative of the judicially-imposed doctrine requiring fundamental fairness in governmental activity in the detection and prosecution of crime. Some of the facts may be summarized, others require detail.

Leaving aside, for the moment, any consideration of the conduct of the informer, we conclude that the government firmly established its case. Government agents, introduced to defendant by the informer, made two separate buys of heroin from defendant, out of the presence of the informer and after negotiation with defendant. Defendant's present appellate claim must, therefore, be founded upon the informer's actions which preceded the sales, made on August 23 and 29, 1973, for which defendant now stands convicted.

Defendant first met the informer, Redman, in early August, 1973. Defendant had been released from prison in the spring of that year, having served a term for robbery "to get drugs." Redman was a paid and professional informer. He received $300 compensation in the case at bar and had participated in his "profession" in at least one hundred cases during the preceding four years. Redman posed as a dealer in illegal drugs, living in and operating from an apartment in Denver, Colorado.

Soon after meeting Redman defendant moved into Redman's apartment, quit his job on August 18, and thereafter shared Redman's life style and purported "generosities" in numerous ways. Defendant paid no rent and had free and ready access to quantities of marijuana that he used at will. Redman stated and testified that such marijuana (some seven ounces) was left with him by prospective sellers as samples. Redman also held several pot parties in the apartment with marijuana being furnished to defendant and to some neighbors. Redman actively hosted these parties in order to obtain the trust and confidence of defendant and others and to establish the pretense of being a dealer in drugs. Redman also

supplied food to defendant and loaned him some money. Undoubtedly Redman's affirmative actions were successful in obtaining defendant's friendship and trust.

The role of the informer is indeed dirty business, but, as many before us have said, so too is heroin. And in this regard defendant is no innocent. The sources for heroin were defendant's own, and his predisposition to engage in drug activity was in no way forced.

Concentrating on the fact that the informer's possession and distribution of marijuana was unlawful, defendant now argues that Redman's conduct was so outrageous that the subsequent prosecution constitutes a violation of the principles of constitutional due process. Thus, defendant continues, the government should have been precluded from invoking the judicial process and obtaining defendant's conviction, and thus we must find that defendant was entrapped as a matter of law.

The same argument was made in United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366, in which the government's undercover agent had supplied Russell, the defendant, with a scarce chemical required for the defendant's manufacturing of methamphetamine, a controlled substance. The Court acknowledged generally the existence of such a defense and suggested that a proper case for its application would arise where the government's activity constituted a denial of " 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment. Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960)." 411 U.S. at 432, 93 S.Ct. at 1643. Significantly, the Court then referred to the peculiar law enforcement tactics necessitated by the nature of drug-related offenses, first noting that infiltration is a permissible means of investigation and then concluding that, because "an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something

of value to offer them", such tactics as culminated in Russell's prosecution did not violate the principles of constitutional due process. 411 U.S. at 432, 93 S.Ct. 1637.

In the instant case, defendant seeks to demonstrate such a violation of constitutional due process, and to distinguish his case from *Russell,* by characterizing Redman's conduct as itself unlawful. Specifically, defendant asserts that Redman violated both federal and state criminal statutes by possessing and distributing marijuana and that these violations by Redman were essential to his success in "setting up" the heroin sales made by the defendant. Relying on the truth of these assertions, defendant contends that his constitutional defense must obtain. Although we cannot deny that Redman possessed and distributed marijuana and that such activity is unlawful, we do not agree that defendant's constitutional defense is thereby successfully made out.

■ The Court in *Russell* did indeed rely, in part, on the *lawful* nature of the government agent's activity in order to distinguish that case from Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, and others in which official lawlessness became the *sine qua non* of the exclusionary rule, to which rule Russell referred without avail.[1] Nevertheless, *Russell* did not establish—nor does it now require us to formulate—a fixed rule that would preclude, for due process reasons, the prosecution of the defendant here because the government's informer engaged in unlawful conduct. *See* 411 U.S. at 431, 93 S.Ct. 1637. We find no occasion to consider whether the test set out in *Russell* should be completely recast, as defendant's argument would have us do, in

terms solely of the lawfulness of the government's informer. Concededly, the nature of that conduct is relevant to the inquiry initiated here by defendant, but we do not believe that a review of the lawfulness of Redman's conduct can by itself answer whether the principles of due process have been violated.[2] Rather, we have considered the entire record before us, and we conclude that the government's conduct was not so outrageous that either the maintenance of the prosecution against the defendant or the resultant conviction violates the constitutional standard, announced in *Russell,* which requires that the government's conduct be tested against notions of fundamental fairness and the universal sense of justice. 411 U.S. at 432, 93 S.Ct. 1637.

Our discussion is not complete, however, without some comment on one additional aspect of the defendant's constitutional argument. We recognize that, under *Russell,* a positive test for "outrageous conduct" is, by itself, reason enough for the reversal of a conviction notwithstanding that the defendant was predisposed, and notwithstanding that a criminal otherwise goes free. It is thus that *Russell's* constitutional standard protects the "sense of justice" referred to in Rochin v. California, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183 (Frankfurter, J.), and in Brown v. Mississippi, 297 U.S. 278, 286, 56 S.Ct. 461, 80 L.Ed. 682 (Hughes, C. J.). Yet it is clear also that, to be relevant at all, the government's conduct must be postured as connected in some way to the commission of the acts for which the defendant stands convicted. In cases decided since *Russell,* in which constitutional arguments have been raised similar to that here, this connection has been implicitly ac-

---

1. The Court noted that the government's conduct in both *Miranda* and *Mapp* constituted violations of independent constitutional rights of the defendants, 411 U.S. at 430, 93 S.Ct. 1637, whereas Russell could make no such claim. In the instant case, the defendant is similarly foreclosed.

2. In Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, the Court stated that an

asserted denial of the protections of due process must "be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." 316 U.S. at 462, 62 S.Ct. at 1256.

knowledged by reference to the extent to which the government instigated, participated in, or was involved or enmeshed in, the criminal activity itself.[3] Thus, the more immediate the impact of the government's conduct upon the particular defendant, the more vigorously would be applied *Russell's* test for constitutional impropriety.

It is significant, then, that in its argument here the government has focused on the periods of time during which the defendant was alone with the government agents—and during which he committed the acts for which he now stands convicted. It was then that he called his sources, negotiated price and quantity, gave directions, acted as intermediary, and offered to arrange future sales of both heroin and other drugs. This was the undisputed testimony of agents Castillo and VanArk. Redman contacted Castillo and introduced him to the defendant; Redman had VanArk contacted by another and spent "three to five minutes" with him at the apartment. That was all. The defendant was then alone with Castillo for some part of over four hours, with VanArk for over one hour and twenty minutes. Neither Redman nor the agents threatened or coerced the defendant. There was no preconceived governmental plan or design of which the defendant was the object. There were only the voluntary acts of the defendant. He had known and had used his sources prior to his having met Redman.

The defendant focuses on Redman. The defendant testified, although not without contradiction, that he purchased a bag of marijuana from Redman on the day they met; that while they lived together Redman usually had marijuana and would either sell it to the defendant or give it to him; that Redman gave him "bennys"; that Redman sold marijuana and "bennys" to others; and that Redman himself took "bennys" and smoked marijuana. The defendant testified that, on the morning he quit his job, Redman suggested that the defendant could make money selling drugs, that there was no need to work. He testified that Redman "kept after me" and that within a few days he agreed with Redman to arrange a sale because "I just felt I owed him a favor," "I just felt obligated to him," "I just did it as a favor." He testified that he could not remember the name or telephone number of his source in Denver and that he did not return to her after delivering the "balloon" to agent VanArk. He testified also that this was incorrect, that he had lied, that he "didn't want to get anybody in trouble."

Redman's testimony differed considerably. He testified that he did not sell marijuana to the defendant; that they had not discussed drugs when they first met; that the defendant asked if he could stay with Redman; that they became close friends; that he faked smoking marijuana to maintain confidence as a drug dealer; that he did not distribute "bennys" but distributed tablets of pure caffein; and that he did not importune the defendant to sell drugs but warned him to "stay out of it." He testified also that the defendant wanted to sell drugs, that the defendant felt "it was the only way he thought he could make money." He testified that he had received seven samples of marijuana from persons who

---

**3.** *Compare* United States v. Register, 5 Cir., 496 F.2d 1072; United States v. Hopkinson, 1 Cir., 492 F.2d 1041, cert. denied, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139 (1974); United States v. Greenbank, 9 Cir., 491 F.2d 184, cert. denied, 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234 (1974); United States v. Rosner, 2 Cir., 485 F.2d 1213, cert. denied, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974); and United States v. McGrath, 7 Cir., 468 F.2d 1027, vacated, 412 U.S. 936, 93 S.Ct. 2769, 37 L.Ed.2d 395, on reconsideration, 494 F.2d 562; *with* United States v. Archer, 2 Cir., 486 F.2d 670; and Greene v. United States, 9 Cir., 454 F.2d 783. *See also* the "government-supplied contraband" cases, United States v. Mosley, 5 Cir., 496 F.2d 1012; United States v. Johnson, 10 Cir., 495 F.2d 242; United States v. Oquendo, 5 Cir., 490 F.2d 161; and United States v. Bueno, 5 Cir., 447 F.2d 903, after remand and new trial, 470 F.2d 154, cert. denied, 411 U.S. 949, 93 S.Ct. 1931, 36 L.Ed.2d 411.

were seeking buyers; that the marijuana was there but that he never offered it to the defendant. There is no evidence that the government in any way directed or controlled Redman's activities. On the contrary, there is evidence that on earlier occasions Redman had been cautioned not to break the law.

█ Our review of this testimony confirms our conclusion, that the government's conduct here does not offend the "sense of justice" referred to in Rochin v. California, *supra,* and Brown v. Mississippi, *supra.* Even if, in regard to Redman's conduct, we were to hold the government's case against the strictest possible standard of probity, we would still be left to grapple, in our effort to consider all the facts as an operative whole, with the defendant's own conduct. We cannot accept defendant's argument, that his own conduct was no more than a function of the government's conduct, that it may be rationalized only by predicating a pervasive and creative participation by the government in the criminal activity.

█ Defendant also asserted at his trial the traditional, nonconstitutional defense of entrapment a valid defense "when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848, *quoting* Sorrells v. United States, 287 U.S. 435, 442, 53 S.Ct. 210, 77 L.Ed. 413. When such a defense is raised, the government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped. Martinez v. United States, 10 Cir., 373 F.2d 810, 812. The defendant now argues that the government failed to carry that burden and that his conviction must therefore be reversed.

█ Having reviewed the evidence in the light most favorable to the government, as we must do, United States v. Twilligear, 10 Cir., 460 F.2d 79, 81–82, we conclude that the government did not fail as a matter of law to prove that the defendant was not entrapped. The defendant was a ready and willing seller of heroin. He had "used heroin, codeine and speed and methadrine," he had used "bennys" and marijuana. He had been previously convicted and sentenced for a robbery "to get drugs." He had two ready sources for heroin, one for himself and one for other people. He had offered to arrange future sales of drugs to both Castillo and VanArk. The defendant was not Redman's votary. They had lived together only a few weeks. In short, defendant was predisposed to commit the crimes for which he stands convicted—he was nothing other than "the unwary criminal." Sherman v. United States, *supra,* 356 U.S. at 372, 78 S.Ct. 819.

█ Defendant finally asserts that the trial court unduly restricted his cross-examination in two instances. On cross-examination· of agent Castillo, defendant's counsel asked whether it was "common practice for informers to supply marijuana to their victims?" The same question was posed to William Coller, an agent for the Drug Enforcement Administration. The trial court sustained the government's objection to each question. Defendant now contends that his subsequent offer of proof on the same point indicates that further interrogation would have shown that informers in fact commonly provided marijuana to their victims and that the agents could not control this kind of activity. Defendant concludes that, because Redman's conduct was so much in issue, the rulings were prejudicial and constitute reversible error. With similar reasoning, defendant also contends that it was reversible error to exclude inquiry into the difficulty encountered by the defendant in finding a job after his release from prison in April, 1973.

We conclude that each of these rulings was within the discretion of the trial court as bearing on subjects capable of creating irrelevant side issues. In regard to the former, there was no show-

ing that the "common practice" was Redman's practice; in regard to the latter, we reject the notion that one's claim to an entrapment defense is controlled by his status as an ex-convict.

Affirmed.