**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**George A. LAMBINUS,
Defendant-Appellant.**

**No. 84–1016.**

United States Court of Appeals,
Tenth Circuit.

Oct. 31, 1984.

**594**

David N. Williams, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., and Stanley K. Kotovsky, Jr., Asst. U.S. Atty., Albuquerque, N.M., with him on the brief), for plaintiff-appellee.

Charles R. Finley of Warner & Finley, Albuquerque, N.M., for defendant-appellant.

Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Defendant Lambinus appeals a jury conviction on Counts II and III of a three-count indictment charging him with three offenses of unauthorized use, acquisition, and possession of food stamps of a value of $100 or more, on or about April 7, April 14, and June 17, 1983, in violation of 7 U.S.C. § 2024(b) (Supp. V 1981). At a previous trial involving the same indictment, Lambinus was acquitted on Count I, but the jury was unable to reach a verdict with respect to Counts II and III. Lambinus raises a number of contentions on appeal following his retrial and conviction on Counts II and III. First, Lambinus argues that the conduct of the Government during the investigation was so outrageous as to deny him due process and thus should bar his prosecution as a matter of law. Second, Lambinus argues that the district court erroneously admitted certain evidence which amounted to an attack on his character. Third, Lambinus contends that the district court erroneously refused to ask prospective jurors his voir dire questions regarding the jury panel's feelings in reference to food stamps. Finally, Lambinus argues that the district court erroneously refused to allow him to testify concerning his poor financial condition during the time of and the time preceding the transactions for which he was indicted, and erroneously refused to permit him to offer his own testimony from his first trial on that issue. We are not convinced by any of Lambinus' arguments and will affirm his conviction.

I.

During the spring of 1983, the Inspector General's Office of the United States Department of Agriculture (USDA) and the Albuquerque Police Department were jointly engaged in the undercover investigation of illegal food stamp trafficking. As a result of this investigation, Lambinus was targeted as a person to approach for illegal food stamp sales. On April 5, 1983, Special Agent Russell Barrett of the USDA and Detective Deborah Kuidis of the Albuquerque Police Department went to Lambinus' upholstery shop in Albuquerque and engaged him in a conversation about some proposed upholstery work. During this conversation, Agent Barrett indicated that they had food stamps for sale or trade. They told Lambinus they were getting $20.00 cash for every $50.00 book of stamps, but they were making better deals when trading for guns. (R.Vol. III at 87, 234.) Lambinus stated that he was not then in a position to trade, but requested that the officers return on April 7. *Id.* at 88, 185.

Agent Barrett and Detective Kuidis returned to Lambinus' shop on April 7, at which time Lambinus traded a set of "headers" (exhaust manifolds) worth $50.00 for $100.00 worth of food stamps. *Id.* at 93, 186. Count I of the indictment, upon which Lambinus was acquitted at his first trial, was predicated on this transaction.

On April 21, 1983, Agent Barrett sent Detective Kuidis and a Detective Ernest Rivera, also of the Albuquerque Police Department, to see Lambinus. They again

offered to trade food stamps for merchandise, but on this occasion Lambinus claimed he had no knowledge of what the officers were talking about. Lambinus did, however, tell Detective Kuidis to have Agent Barrett call him. *Id.* at 179–180; 188–189.

Agent Barrett contacted Lambinus the following day. During this conversation, according to Agent Barrett's testimony, Lambinus said that thereafter he would deal only with Agent Barrett because he was concerned that one of the persons who came to his shop the day before could have been a police officer. *Id.* at 97. Lambinus denied this conversation ever occurred. *Id.* at 249.

Agent Barrett's next meeting with Lambinus occurred on June 14, 1983. At this meeting, according to Agent Barrett's testimony, Agent Barrett indicated he was about to open a secondhand store which he was in the process of stocking, but he expressed concern that the merchandise he was trading for might be "hot." Lambinus told Agent Barrett he would be getting in some Sears Craftsman power tools which, though stolen, could not be traced. (*Id.*) Lambinus, however, denied he ever dealt in stolen tools. *Id.* at 228. This meeting ended with Lambinus' trading a water heater and pair of skis, worth approximately $110.00 according to Lambinus (*Id.* at 251), for $300.00 worth of food stamps. *Id.* at 100. Count II of the indictment was predicated on this transaction, and Lambinus was found guilty on this count at his second trial.

On June 17, 1983, Agent Barrett again went to Lambinus' shop. Lambinus said he had an air impact wrench and air ratchet which he was willing to trade, and which he said were worth about $250. *Id.* at 104. Lambinus traded these tools to Agent Barrett for $350.00 worth of food stamps. This transaction served as the basis of Count III in the indictment, and Lambinus was also found guilty on this count in his second trial.

Additional facts, as they become relevant, will appear in the body of the opinion.

## II.

Prior to trial Lambinus filed a Motion to Dismiss the indictment on the ground that the Government's conduct in the investigation and prosecution of its case against Lambinus was so egregious as to constitute a denial of due process. (R.Vol. I at 16). The trial court reserved ruling on this motion until all the evidence had been presented, at which time it ruled against Lambinus. We hold that the court did not err in so ruling.

This Court has repeatedly reiterated the Supreme Court's statement in *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973), that some day the situation might arise "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Salazar,* 720 F.2d 1482, 1488 (10th Cir.1983); *United States v. Monaco,* 700 F.2d 577, 580 (10th Cir.1983); *United States v. Biswell,* 700 F.2d 1310, 1313–1314 (10th Cir.1983). Yet we have also reiterated the Supreme Court's caution that "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *United States v. Burrell,* 720 F.2d 1488 (10th Cir.1983), quoting *Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell J., concurring). We do not believe that the Government involvement in this case reached such a level.

In support of his claim of outrageous Governmental conduct, Lambinus refers us to the following evidence: (1) Lambinus' own testimony that Agent Barrett came to his upholstery shop two or three times before April 5, 1983, and that on each of these occasions Barrett offered to sell food stamps and on each occasion Lambinus refused; (2) Agent Barrett's "repeated" offers to sell cocaine and marijuana to Lambinus; (3) the "ridiculously excessive offers" made by Agent Barrett to trade merchandise for food stamps; (4) the targeting of

Lambinus based on an alleged fencing operation being run from his upholstery shop; and (5) Agent Barrett's failure to follow USDA regulations in investigating food stamp abuses.

Lambinus relies principally on our decision in *United States v. Spivey*, 508 F.2d 146 (10th Cir.1975), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975), for his contention that this evidence establishes outrageous conduct and therefore a denial of due process. In *Spivey*, we examined "the extent to which the government instigated, participated in, or was involved or enmeshed in, the criminal activity itself" in gauging whether the facts warranted a finding of a denial of due process. *Spivey, supra*, 508 F.2d at 150. There, in finding no due process violation, we focused on the voluntary nature of Spivey's acts during the time periods in which he committed the acts for which he was convicted. *Id.* Here, though Lambinus testified that Agent Barrett and Detective Kuidis approached him several times prior to April 5, 1983, both Agent Barrett and Detective Kuidis testified that April 5th was the first time they approached Lambinus. At that meeting and each of Barrett's meetings with Lambinus thereafter, Lambinus never hesitated when given the opportunity to purchase food stamps. Even on the occasion when Barrett sent Detectives Kuidis and Rivera in his place, Lambinus did not refuse to deal in food stamps; he simply declined to deal with anyone but Barrett. In testimony corroborated by Detective Kuidis, Agent Barrett also testified that Lambinus offered them his business card and telephone number so as to facilitate future exchanges. (R. Vol. III at 94, 187.) Though Lambinus denied giving his card to the officers to facilitate future food stamp transactions, his testimony was uncorroborated. *Cf. United States v. Gurule*, 522 F.2d 20, 25 (10th Cir.1975), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976). We accept the finding and conclusion of the trial judge here rejecting the outrageous conduct defense.

■ Lambinus also complains about Agent Barrett's offers to sell cocaine and marijuana, matters he asserts bear no relation to food stamp trafficking. (Appellant's Brief-in-Chief at 6.) Assuming these offers were unrelated to the food stamp investigation, Lambinus' argument lends no support to his outrageous conduct defense in light of our statement in *Spivey, supra*, 508 F.2d at 149, "that, to be relevant at all, the government's conduct must be postured as connected in some way to the commission of the acts for which the defendant stands convicted." Since Lambinus asserts that the drug offers were unrelated to the acts for which he stands convicted, it follows that those offers are not relevant to his outrageous Governmental conduct defense.

■ As to the alleged impropriety of the Government's method of targeting Lambinus, we have repeatedly held that "[a]ny absence of a reasonable basis for initiation of the undercover investigation does not bar the prosecution." *Biswell, supra*, 700 F.2d at 1314; *Salazar, supra*, 720 F.2d at 1488. We are similarly convinced that the remaining Governmental acts, even considering the record in the most favorable light for Lambinus, do not rise to the level where this prosecution should be barred on due process grounds. Furthermore, we hold that there was no error in refusing to submit the due process issue to the jury. *See, e.g., Salazar, supra*, 720 F.2d at 1488.

### III.

Relying on three adverse evidentiary rulings, Lambinus asserts that the trial court erred by allowing the Government to introduce evidence which went only to show that Lambinus had a criminal character and that he acted in conformity therewith. (Appellant's Brief-in-Chief at 20.) We do not agree.

■ Lambinus first maintains that the trial court erred in allowing the jury to listen to the tape of and to read the typed transcript of a telephone conversation which occurred between Lambinus and

Agent Barrett several days after the last transaction for which he was indicted. The trial court specifically admitted the taped conversation and transcript, in which Lambinus said, "I sold the ones [food stamp books] you gave to me for $25.00 each," under Rule 404(b) of the Federal Rules of Evidence. *Id.* at 111. The trial court, after considering Lambinus' contention that the evidence was prejudicial and irrelevant, specifically referred to Rule 404(b) and admitted the tape and transcript as evidence of Lambinus' intent and his knowledge of the illegal nature of his acts. *Id.* at 110. Lambinus cites our decision in *Biswell, supra,* for the proposition that admission of the tape and transcript was in the nature of a general attack on his character. In *Biswell,* we noted that neither the Government nor the trial court had suggested a basis upon which the evidence of other crimes or misconduct could be admitted. *Biswell, supra,* 700 F.2d at 1317. Here, however, the Government specifically suggested that this conversation be admitted as going to knowledge and intent. In *Biswell* we also found it significant that the offered evidence of other crimes and misconduct was unrelated to the offense being tried. Here, the testimony as to what Lambinus had done with food stamps he received previously was proof of his unlawful use and possession of those stamps, thereby constituting elements of the very offense for which he was being tried. Similarly, evidence of what he had done with the stamps, coupled with the inference that he had obtained a profit upon their sale, shows his intent, knowledge, and motive for accepting the food stamps. In sum, it is our view that the trial court did not abuse its discretion in admitting the tape under Rule 404(b).

■ We are also unpersuaded that Lambinus was further prejudiced when the trial court allowed the jury to read a transcript of the conversation while listening to the tape. Counsel for Lambinus admitted that the transcript was accurate, except for one "minor correction" *Id.* at 113, and the trial court cautioned the jury that it was being admitted only "for the limited and second-ary purpose of aiding you in following the content of the conversation ... and in identifying the speakers." *Id.* at 117. It is uncontested that the trial court may, in some circumstances, employ supplemental transcripts to assist the jury in following a recorded conversation. *United States v. Lucero,* 601 F.2d 1147, 1149 (10th Cir.1979). We find no error in the jury's use of the transcripts in this case.

■ Lambinus raises similar contentions regarding the trial court's admission of Detective Rivera's testimony regarding the conversation which transpired the date Detectives Rivera and Kuidis came to his shop. It is unclear whether Lambinus' contention on appeal is that the testimony was hearsay or, as with his previous contention, that its admission amounts to a character attack, but we would hold the evidence admissible in either case. Rivera testified that Kuidis offered to sell Lambinus food stamps. *Id.* at 179. Counsel for Lambinus objected on hearsay grounds. *Id.* The Government responded that the statements were being offered for their effect on the listener, a nonhearsay use, and the court admitted them for that purpose. *Id.* We agree that Rivera's testimony was not hearsay. Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement ... offered in evidence to prove the truth of the matter asserted." Rivera's testimony was not offered to prove that Kuidis offered to sell Lambinus food stamps; it was offered for its effect on Lambinus and his knowledge of the illegality of his food stamp transactions. And, in fact, Kuidis' offer to trade food stamps did have an effect on the listener: Lambinus asked Kuidis to have Agent Barrett call him. When Agent Barrett did call, Lambinus said that thereafter he would trade only with Agent Barrett, because he was worried that others sent by Agent Barrett might be law enforcement officers. Based on this conduct, the jury could reasonably have inferred that Lambinus knew the food stamp transactions he was engaging in were illegal. *See Hernandez v. United States,* 608 F.2d 1361, 1364 (10th Cir.1979).

Inasmuch as this evidence goes to Lambinus' knowledge, it is also admissible under Rule 404(b) of the Federal Rules of Evidence. Accordingly, we find no error in the court's admission of Rivera's testimony.

▮ Lambinus' final objection to the trial court's evidentiary rulings concerns a conversation between Lambinus and a Detective Guthrie of the Albuquerque Police Department which occurred in March, 1983, at Lambinus' upholstery shop. On cross-examination, the Government asked Lambinus whether he told Detective Guthrie that certain Sears Craftsman tools in his shop were stolen but untraceable. *Id.* at 257. Lambinus answered, "No." *Id.* These were the same tools for which Agent Barrett later traded $350.00 worth of food stamps. *Id.* Agent Barrett had previously testified that Lambinus had told him the tools were stolen but untraceable. Thus, the cross-examination of Lambinus regarding his conversation in March with Detective Guthrie was admissible for the limited purpose of impeaching Lambinus' credibility and corroborating Agent Barrett. Fed. R.Evid. 608(b). Consequently, this is not a case of repeated Government references connecting Lambinus with ongoing criminal investigations and placing him, by implication, in a group involved in ongoing criminal activity, a practice we found objectionable in *Biswell, supra,* 700 F.2d at 1316. Moreover, the extent of cross-examination is left to the discretion of the trial court, *United States v. Haro,* 573 F.2d 661, 667 (10th Cir.1978), *cert. denied,* 439 U.S. 851, 99 S.Ct. 156, 58 L.Ed.2d 155 (1978). We find no abuse of discretion in admitting the questioning regarding the conversation with Detective Guthrie.

IV.

▮ Lambinus argues that the trial court erred in refusing to ask prospective jurors during the voir dire his questions dealing with their feelings in reference to food stamps. The trial court is vested with wide discretion in the conduct of voir dire, and this discretion should not be disturbed unless there is a clear showing of abuse. *United States v. Ainesworth,* 716 F.2d 769–70 (10th Cir.1983); *United States v. Hall,* 536 F.2d 313, 324 (10th Cir.1976), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976). The court asked whether any of the jurors had previously served as jurors, especially in a food stamp case, whether any of the jurors had been victims of crimes, whether they knew the defendant, and whether they had feelings for or against the Government. These questions, together with the others propounded by the court, adequately tested the qualifications and competency of the jurors. We find no abuse of discretion.

▮ Finally, Lambinus claims he was prejudiced because the trial court refused both to let him testify concerning his poor financial condition and to offer his testimony from his previous trial on that same issue. He asserts that this evidence should have been admitted because one of his defenses was entrapment, which necessarily raises the issue of his predisposition to commit the crime. (Appellant's Brief-in-Chief at 25.) The contention apparently is that his poor financial condition made him more susceptible to inducement and, consequently, more easily entrapped. We rejected a similar argument, however, in *Spivey, supra.* There, in order to bolster his entrapment defense, Spivey attempted to introduce evidence of the difficulty he was having in finding a job. *Spivey, supra,* 508 F.2d at 151. We upheld the trial court's refusal in that case to admit such evidence on the basis that it could lead to irrelevant side issues. (*Id.*) The same reasoning applies here. We conclude that evidence of Lambinus' financial condition was irrelevant. Thus, it follows that it likewise was not error to deny him use of his own testimony from his first trial on that same issue.

AFFIRMED.