937 F.2d 617
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Diane AESCHBACHER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ron GILLIS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gary BARKDOLL, Defendant-Appellant.
 Nos. 90-8048, 90-8054 and 90-8055.
 United States Court of Appeals, Tenth Circuit.
 July 3, 1991.
 
 Before McKAY, SETH and LOGAN, Circuit Judges.
 ORDER AND JUDGMENT*
 SETH, Circuit Judge.
 
 
 1
 Appellants Diane Aeschbacher, Ron Gillis and Gary Barkdoll were charged under a single indictment for various charges arising out of a methamphetamine distribution scheme, in violation of 21 U.S.C. Secs. 841(a)(1), 841(b)(1)(C) and 846. In addition to the above mentioned charges, Gillis and Barkdoll were indicted on violations of 18 U.S.C. Sec. 924(c)(1). Aeschbacher was also charged with violating 18 U.S.C. Sec. 1952(a)(1). They were convicted on all counts in a consolidated trial before a jury. Their contentions of error, either raised individually or by a group, are addressed in turn.
 
 Statement of the Facts
 
 2
 In February 1988, the Campbell County Sheriff's Office initiated an investigation into illegal drug trafficking activities in the Gillette, Wyoming area. David Baumgardner, a paid confidential informant, was hired to infiltrate the operation.
 
 
 3
 As part of the investigation, Baumgardner approached Marvin Aeschbacher ("Moe") in an attempt to purchase one pound of methamphetamine. Moe along with his girlfriend, Cindy Hanneman, went to Ron Gillis' home in Glenrock, Wyoming, to purchase a pound of methamphetamine. When Gillis told Moe that he could not supply that amount, Moe asked his uncle, William Aeschbacher, if he knew of a source capable of providing a pound of methamphetamine. William Aeschbacher told him that he thought David Ranger, who resided in California, might be able to supply that amount.
 
 
 4
 William Aeschbacher contacted Ranger by telephone. Ranger told him that he would only deal with Diane Aeschbacher, William's wife. After discussing the deal with Diane Aeschbacher, Ranger ultimately agreed to supply the pound of methamphetamine.
 
 
 5
 William Aeschbacher drove to Dupuyer, Montana, to pick up Diane Aeschbacher. They both returned to Gillette where they met with Moe to make further plans. The three of them left Gillette, headed for California to meet with Ranger. While en route, Moe was stopped for a traffic violation and decided not to continue with the drug transaction, at least at that time. Hanneman drove Moe to the Casper airport where he took a flight to California to see another girlfriend.
 
 
 6
 Thereafter, Hanneman, William and Diane Aeschbacher decided to continue with the purchase. Hanneman met with Baumgardner and another undercover agent where they agreed upon a price of $16,000 for the pound of methamphetamine. Hanneman, William and Diane Aeschbacher drove to California in Hanneman's car.
 
 
 7
 Upon arriving in California, Diane Aeschbacher contacted Ranger and he agreed to introduce Moe to his contact, Troll. Hanneman contacted Moe, who ultimately decided to proceed with the transaction. Moe then contacted Baumgardner, who subsequently agreed to wire an additional $5,000 to Hanneman. Upon receipt, Hanneman gave the money to Moe and returned to Gillette.
 
 
 8
 Moe, William and Diane Aeschbacher drove to Ranger's apartment. Troll arrived and took Moe into the foothills where he delivered 12 and 3/4 ounces of methamphetamine. Moe returned to Ranger's apartment and repackaged the drug. He used some of it with the others and gave some to Ranger for his services.
 
 
 9
 The three departed California in Hanneman's vehicle. Along the way, Moe expressed some doubt about Baumgardner. He then asked Gillis to meet him in Casper to help determine whether Baumgardner was a confidential informant. Moe, William and Diane Aeschbacher met with Gillis and his friend, Gary Barkdoll. Moe told the Aeschbachers to take Hanneman's car and return to Gillette. Moe, Gillis and Barkdoll then drove to the Eastridge Mall in Casper where Gillis bought Inositol, a cutting agent, for the methamphetamine. At that time, Barkdoll told Moe that Baumgardner's description was similar to that of a confidential informant used by the Wyoming law enforcement authorities.
 
 
 10
 The three drove to Gillis' house in Glenrock and "cut" the methamphetamine with the Inositol. They packaged up the methamphetamine and drove to Gillette to determine whether Baumgardner was the same confidential informant used by the Wyoming law enforcement authorities. As they were driving to Gillette, Moe noticed a firearm under the seat and indicated that he wanted to shoot Baumgardner. When they arrived in Gillette, they picked up Hanneman, saw the Aeschbachers and identified Baumgardner as the same confidential informant. Moe then told the Aeschbachers that he would contact them later and gave them some money.
 
 
 11
 Moe, Gillis, Barkdoll and Hanneman returned to Glenrock. Moe sold the methamphetamine to Gillis and Barkdoll and returned to California. Barkdoll and Hanneman used some of the drugs and sold some in the Riverton area.
 
 
 12
 Hanneman returned to Gillette and was ultimately arrested in connection with this case. She confessed as to her involvement and, in exchange for her testimony, the charges against her were dismissed. William and Diane Aeschbacher were subsequently contacted by the authorities. William pled guilty to the charge of conspiracy and testified on behalf of the government. Moe pled guilty to three state felony charges but was not prosecuted federally. He also testified at the trial. Ranger pled guilty to the charge of conspiracy and testified at the trial. All three appellants testified on their own behalf, denying their involvement in the conspiracy.
 
 Severance
 
 13
 Appellants Aeschbacher, Gillis and Barkdoll challenge the trial court's denial of their motions for severance. Defendants charged jointly "are not entitled to separate trials as a matter of right." Bailey v. United States, 410 F.2d 1209, 1213 (10th Cir.). The trial court, however, has the discretion to grant a severance where joinder would prejudice one of the parties. Fed.R.Crim.P. 14. The decision to grant or deny a motion for severance requires the trial court to weigh the prejudice to the defendants against "considerations of economy and expedition in judicial administration." United States v. Petersen, 611 F.2d 1313, 1331 (10th Cir.).
 
 
 14
 On appeal, the defendant bears a heavy burden of showing actual prejudice as a result of the denial, United States v. Hack, 782 F.2d 862, 870 (10th Cir.), and the trial court's decision will not be disturbed absent an abuse of discretion. United States v. Cardall, 885 F.2d 656, 667 (10th Cir.). To establish an abuse of discretion, the defendant must demonstrate that the denial of severance deprived him of his right to a fair trial, United States v. Butler, 494 F.2d 1246, 1256 (10th Cir.), and "not merely that a separate trial might have offered him a better chance of acquittal." United States v. Pack, 773 F.2d 261, 267 (10th Cir.) (quoting United States v. Edwards, 488 F.2d 1154, 1160 (5th Cir.)).
 
 
 15
 Appellants advance several reasons to support their argument that the trial court abused its discretion in denying their motions for severance. Central to all of their arguments is the contention that the evidence at trial demonstrated that two separate and distinct conspiracies existed, not the single conspiracy charged.
 
 
 16
 To obtain a conspiracy conviction, the government must establish: (1) the existence of a conspiracy; (2) the defendant knew the essential objectives of that conspiracy; and (3) the defendant knowingly and voluntarily participated in that conspiracy. United States v. Bowie, 892 F.2d 1494, 1497 (10th Cir.) (citing United States v. Savaiano, 843 F.2d 1280, 1294 (10th Cir.)). "A defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role." Savaiano, 843 F.2d at 1294 (citing United States v. Badolato, 701 F.2d 915, 920 (11th Cir.)). Separate transactions may constitute a single conspiracy where they are " 'essential and integral steps toward the realization of a common, illicit goal.' " United States v. Dickey, 736 F.2d 571, 582 (10th Cir.) (quoting United States v. Brewer, 630 F.2d 795, 799 (10th Cir.)).
 
 
 17
 We must conclude that the evidence presented at trial established the existence of one single conspiracy rather than two separate and distinct conspiracies. The evidence showed that appellants knowingly and voluntarily participated in one conspiracy, the thrust of which was to obtain methamphetamine and distribute it for profit. Their roles were essential to the goal of distributing methamphetamine for profit. Aeschbacher was instrumental in obtaining the methamphetamine while Gillis and Barkdoll were necessary for its distribution. The fact that Aeschbacher did not know Gillis and Barkdoll is immaterial.
 
 
 18
 Appellants' claim that as a result of their joint trial they were forced to contend with the "spill-over" effect of evidence introduced against the other defendants is unpersuasive. The fact that they may have had a better change of acquittal without the "spill-over" effect does not warrant severance. See Cardall, 885 F.2d at 668. See also United States v. Mabry, 809 F.2d 671, 682-83 (10th Cir.).
 
 
 19
 Gillis and Barkdoll also claim that the trial court erred in denying their motions for severance because their defenses on the firearm charges were antagonistic with one another and Agent Hughes' testimony concerning their respective confessions prejudiced their cases. Both Gillis and Barkdoll gave statements to the authorities as to their involvement in the methamphetamine conspiracy. Agent Hughes subsequently testified at trial concerning those statements.
 
 
 20
 Upon review of the record, it appears that their defenses were compatible with the other. Gillis and Barkdoll both denied the existence of the firearm and neither directly implicated the other. While Agent Hughes testified that Barkdoll admitted the presence of a firearm in the vehicle, Barkdoll denied making this statement at trial. Therefore, we do not find this argument persuasive.
 
 
 21
 As to Agent Hughes' testimony concerning Gillis' confession, Barkdoll was not implicated in any manner. While Agent Hughes' testimony referred to Gillis' involvement, he avoided using Gillis' name. At trial, both Gillis and Barkdoll testified and were subject to cross-examination. Further, the trial court cautioned the jury that the confessions could only be considered as evidence against the defendant who made the statement. See United States v. Peveto, 881 F.2d 844, 851 (10th Cir.) (cautionary instructions are usually sufficient to cure any prejudice alleged by the defendant). Without evidence to the contrary, we can presume that the jury fulfilled its task and followed the trial court's instructions. United States v. Lane, 883 F.2d 1484, 1498 (10th Cir.). We cannot say that Agent Hughes' testimony concerning their confessions was so prejudicial as to result in the denial of a fair trial. We must conclude that the trial court did not abuse its discretion in denying their motions for severance.
 
 Firearm Offense
 
 22
 Appellants Gillis and Barkdoll challenge the sufficiency of the evidence to sustain their convictions under 18 U.S.C. Sec. 924(c)(1), which penalizes a defendant who "uses or carries" a firearm during or in relation to a drug trafficking crime. In considering sufficiency of the evidence claims, we "view the proof presented in the light most favorable to the government to ascertain if there is sufficient substantial proof, direct and circumstantial, together with reasonable inferences to be drawn therefrom, from which a jury might find a defendant guilty beyond a reasonable doubt." United States v. Sullivan, 919 F.2d 1403, 1431 (10th Cir.).
 
 
 23
 In order to convict Gillis or Barkdoll under 18 U.S.C. Sec. 924(c)(1), the government was required to prove beyond a reasonable doubt that they had " 'ready access' to the firearm and the firearm 'was an integral part of [the] criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed,' " United States v. Williams, 923 F.2d 1397, 1402-03 (10th Cir.) (quoting United States v. McKinnell, 888 F.2d 669, 675 (10th Cir.)) (quoting United States v. Matra, 841 F.2d 837, 843 (8th Cir.)), or that one of their co-conspirators committed this crime during and in furtherance of the conspiracy and that this act was a reasonably foreseeable consequence of the conspiracy. Pinkerton v. United States, 328 U.S. 640, 647-48. It is not necessary that the government prove that the firearm was displayed or brandished, United States v. Moore, 919 F.2d 1471, 1475 (10th Cir.), or that the firearm was actually loaded during the drug trafficking offense. United States v. Martinez, 912 F.2d 419 (10th Cir.).
 
 
 24
 The government met its burden of proof. In its case, the government presented evidence that two firearms were involved in the conspiracy. Moe testified that while travelling with Gillis and Barkdoll between Glenrock and Gillette with the methamphetamine, he noticed a firearm under the seat in the vehicle. Barkdoll also admitted to Agent Kevin Hughes that there was a firearm in the vehicle. Moe further testified that Gillis and Barkdoll were afraid that he was going to take the firearm and shoot Baumgardner. Although the other occupants in the car deny that this conversation occurred, viewing the evidence in the light most favorable to the government, the jury could have believed Moe's testimony that a firearm was in the vehicle, that all of the co-conspirators were aware of its presence, that the firearm was readily accessible to any of the co-conspirators, and that it was an integral part of their criminal undertaking by providing a means of protecting the methamphetamine operation in the course of the drug transactions. Based upon this evidence and the reasonable inferences therefrom, a reasonable jury could have found that the evidence was sufficient to sustain the convictions of Gillis and Barkdoll on the firearm charges.
 
 Lesser Included Offense
 
 25
 Appellants Aeschbacher and Barkdoll challenge the trial court's denial of their requests for jury instructions on a lesser included offense of simple possession. They claim that the jury could have found them guilty of possession of methamphetamine without having expressly joined the conspiracy, and that the trial court's failure to instruct on a lesser included offense deprived them of their theory of the case.
 
 
 26
 When reviewing a claim of error relating to jury instructions, we review the instructions as a whole. United States v. Park, 421 U.S. 658, 674. "Although a criminal defendant is entitled to an instruction regarding his theory of the case, a trial judge is given substantial latitude and discretion in tailoring and formulating the instructions so long as they are correct statements of law and fairly and adequately cover the issues presented." Pack, 773 F.2d at 267.
 
 
 27
 In Fitzgerald v. United States, 719 F.2d 1069, 1071 (10th Cir.), we set out the requirements which a defendant must satisfy in order to warrant a lesser included offense instruction:
 
 
 28
 "1. A proper request.
 
 
 29
 "2. The lesser included offense consists of some, but not all, of the elements of the offense charged.
 
 
 30
 "3. The elements differentiating the two offenses is a matter in dispute.
 
 
 31
 "4. A jury could rationally convict the defendant of the lesser offense and acquit of the greater offense."
 
 
 32
 "Failure to meet any part of the test is fatal for the defendant." United States v. Joe, 831 F.2d 218, 219 (10th Cir.).
 
 
 33
 While appellants met the first two requirements of the test, they did not satisfy the remaining two. In support of their argument that the elements differentiating the two offenses were sufficiently in dispute, they argue that the jury could have found that they possessed the methamphetamine during the period when the conspiracy was in operation but were not actual members of the conspiracy. While the evidence may be construed so as to support this theory, we have held that "[a]bsent some evidence to counter the strong inference of [the offense charged] ... the issue is not elevated to a truly disputed one." Id. at 220 (quoting United States v. Rogers, 504 F.2d 1079, 1084 (5th Cir.)).
 
 
 34
 As indicated above, there was overwhelming evidence regarding the involvement of both Aeschbacher and Barkdoll in the conspiracy. Both of their roles were instrumental in the success of the methamphetamine operation. Without Aeschbacher's involvement, there would not have been any methamphetamine to distribute. The evidence demonstrated that she knowingly and voluntarily participated in the conspiracy. Once Moe sold the methamphetamine to Barkdoll and Gillis, Barkdoll was responsible for the actual distribution of the methamphetamine in the Riverton area.
 
 
 35
 Given the overwhelming evidence, a rational jury could not have convicted on the lesser charge and acquitted appellants on the greater offense charged. We must conclude that the trial court's refusal to instruct on a lesser included offense was not an abuse of discretion.
 
 Outrageous Conduct
 
 36
 Appellants Aeschbacher and Barkdoll challenge their conspiracy convictions asserting that the government's conduct as a whole was outrageous and violated fundamental notions of due process. They claim that they were minor pawns in a government created scheme and that there was no predisposition on their parts to commit the offenses. They further challenge the trial court's failure to give an outrageous conduct instruction.
 
 
 37
 When a claim of outrageous conduct is asserted, we review the conduct against notions of "fundamental fairness" and "the universal sense of justice" considering the entire record before us. United States v. Spivey, 508 F.2d 146, 151 (10th Cir.) (quoting United States v. Russell, 411 U.S. 423, 432).
 
 
 38
 Having reviewed the record, the government's conduct was not so outrageous as to violate fundamental fairness or the universal sense of justice. The government paid an informant to infiltrate the methamphetamine conspiracy already in operation in the Gillette area. Appellants voluntarily joined and knowingly participated in the conspiracy without any contact by the government or its agents until after the conspiracy had ended. Having found no evidence of outrageous conduct on the part of the government, we must further conclude that the trial court's denial of a related instruction was not an abuse of discretion.
 
 Co-conspirator Statements
 
 39
 Appellants Aeschbacher and Barkdoll challenge the sufficiency of the evidence presented before the trial court in determining the admissibility of the co-conspirators' statements, claiming that the verbal proffer made by the government was insufficient. We have given considerable discretion to the trial court in determining the admissibility of co-conspirator statements, United States v. Mobile Materials, Inc., 881 F.2d 866, 869 (10th Cir.) (citing United States v. Hernandez, 829 F.2d 988, 994 (10th Cir.)), and in the procedures used to make that determination. See United States v. Austin, 786 F.2d 986, 990 (10th Cir.). We will not reverse the trial court's determination absent an abuse of discretion. United States v. Wolf, 839 F.2d 1387 (10th Cir.).
 
 
 40
 There was not such an abuse in this instance. By verbal proffer, the government presented to the trial court during a pretrial hearing what it expected the evidence would show at trial. This included, among other things, testimony from witnesses, traffic tickets, hotel receipts, and the hearsay statements themselves. See Mobile Materials, 881 F.2d at 869 (citing Bourjaily v. United States, 483 U.S. 171, 181) (trial court may consider independent evidence as well as the actual hearsay statements in determining the admissibility of the statements). The trial court concluded that the government's proffer and the evidence presented demonstrated that a conspiracy existed; that the three appellants were members of that conspiracy; and that the statements were made during the course and in furtherance of the conspiracy. At the conclusion of the trial, it was apparent that the proffered statements made by the government conformed with the evidence subsequently presented. We cannot say that the trial court abused its discretion in accepting the proffered statements. See Hernandez, 829 F.2d at 994 (court may be able to determine the admissibility of the hearsay statements on the basis of verbal proffers, on the opening statement, or on what it knows of the evidence based upon pretrial or suppression hearings).
 
 Aeschbacher's New Evidence
 
 41
 Appellant Aeschbacher challenges the trial court's denial of her motion for a new trial or a judgment of acquittal based upon newly discovered evidence. In considering such motions, the trial court must determine whether the new evidence is "material to the issues involved" and "must be such that it would probably produce an acquittal." United States v. Sutton, 767 F.2d 726, 728 (10th Cir.). The evidence must be more than impeaching or cumulative. We will not disturb the decision of the trial court absent an abuse of discretion.
 
 
 42
 In support of her motions, appellant Aeschbacher presented "newly discovered evidence" consisting of letters written by her husband, William Aeschbacher. In ruling upon the motions, the trial court found that the letters were simply an acknowledgment of his guilt and that the testimony of William Aeschbacher at trial was not inconsistent with the letters. It further found Ranger's testimony implicating Diane Aeschbacher was the most credible, and that the jury properly arrived at that conclusion in finding her guilty. Upon review of the letters, we agree with the trial court and conclude that the letters are insufficient to provide a basis for an acquittal.
 
 Rule 404(b) Evidence
 
 43
 Appellant Gillis challenges the admission of evidence concerning a meeting he had with Moe and Hanneman where they discussed the possibility of Gillis supplying the methamphetamine. On appeal, he claims that the admission of this evidence violated Fed.R.Evid. 404(b); however, at trial, he objected on the grounds of hearsay. We have held that "[t]he specific ground for reversal of an evidentiary ruling on appeal must also be the same as that raised at trial." United States v. Taylor, 800 F.2d 1012, 1017 (10th Cir.) (citing Fortier v. Dona Anna Plaza Partners, 747 F.2d 1324, 1331 (10th Cir.)). Absent a proper and timely objection, we will reverse only for plain error. United States v. Lonedog, 929 F.2d 568, 570 (10th Cir.). In order to determine whether the trial court has committed plain error, we must review the entire record. United States v. Culpepper, 834 F.2d 879, 883 (10th Cir.).
 
 
 44
 Fed.R.Evid. 404(b) governs the admissibility of other crimes evidence. In Culpepper, we stated that "evidence of other crimes or acts relevant to any issue at trial may be admitted unless this evidence tends to prove only criminal disposition." Id. at 883 (citing United States v. DeLuna, 763 F.2d 897, 912 (8th Cir.)). In determining the admissibility of this evidence, the trial court must weigh its probative value against its prejudicial effect. Fed.R.Evid. 403.
 
 
 45
 Upon a review of the record, we cannot say the admission of appellant's prior drug dealings constituted plain error. The evidence concerning his prior drug dealings with the co-conspirators was inextricably intertwined with the methamphetamine conspiracy charged in the Indictment. It was relevant to show why Moe contacted Gillis for help in the operation of the conspiracy and to show Gillis' knowledge of Moe's activities in dealing in methamphetamine. It was not admitted to show a general criminal disposition on the part of Gillis. Its probative value outweighed any prejudicial effect. Further, there was overwhelming evidence of Gillis' involvement in the conspiracy; therefore, the admission of the evidence did not rise to the level of plain error.
 
 Gillis' Sentence
 
 46
 Appellant Gillis also challenges the trial court's determination that his role was minor rather than minimal. "A finding that a defendant is or is not a minor participant is a finding of fact," United States v. Arredondo-Santos, 911 F.2d 424, 425 (10th Cir.); therefore, we review the trial court's determination under the clearly erroneous standard. United States v. Alvarez, 914 F.2d 213 (10th Cir.).
 
 
 47
 At the sentencing hearing, Gillis requested a downward departure for his role in the conspiracy as a "minimal participant" because he was not involved in the acquisition of the methamphetamine from California. Although the trial court conceded that Gillis did not join the conspiracy until later, it found that he was the "brains" behind the conspiracy and acted as the advisor to the other members of the conspiracy. Balancing those facts, the trial court awarded Gillis a two level downward departure for having a "minor" role in the conspiracy.
 
 
 48
 Gillis claims that his role was minimal because he was not involved in the acquisition of the methamphetamine from California and his role was merely to determine whether Baumgardner was a confidential informant. While it is true that Gillis did not join the conspiracy until Moe returned from California, his role was much more than determining whether Baumgardner was a confidential informant. Once Gillis joined the conspiracy, the whole focus of the conspiracy shifted. Gillis introduced Moe to Barkdoll, who ultimately identified Baumgardner as a confidential informant. Gillis was also responsible for introducing firearms into the operation. Once Baumgardner was identified, Gillis participated in devising a new distribution plan for the methamphetamine. Given these facts, we cannot say that the trial court erred in awarding a two level downward departure for Gillis' role as a minor participant rather than the four level downward departure he requested.
 
 
 49
 The judgments of the United States District Court for the District of Wyoming against appellants and the sentences are AFFIRMED.
 
 
 50
 IT IS SO ORDERED.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3